[Cite as *In re M.H.*, 2016-Ohio-1509.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                |   | JUDGES: |
|----------------|---|---------|
| IN RE: M.H.    | : | Hon. W. Scott Gwin, P.J. |
|                | : | Hon. Patricia A. Delaney, J. |
|                | : | Hon. Craig R. Baldwin, J. |
|                | : | |
|                | : | |
|                | : | Case No. CT2015-0061 |
|                | : | |
|                | : | |
|                | : | OPINION |


CHARACTER OF PROCEEDING:      Civil appeal from the Muskingum County
Court of Common Pleas, Juvenile Division,
Case No. 21430018


JUDGMENT:      Affirmed


DATE OF JUDGMENT ENTRY:      April 11, 2016


APPEARANCES:

For-Appellee
D. MICHAEL HADDOX
BY: GERALD ANDERSON II.
27 North Fifth St., Box 189
Zanesville, OH 43702-0189

For Keith Hostottle – Maternal Grandfather
R. SCOTT PATTERSON
2609 Bell St.
Zanesville, OH 43701

*Gwin, P.J.*

{¶1} Appellant Keith Hostottle ["Grandfather]" appeals the October 25, 2015 judgment entry of the Muskingum County Court of Common Pleas, Juvenile Division. Appellee is Muskingum County Children's Services ["MCCS"].

*Facts and Procedural History*

{¶2} On December 1, 2013, MCCS upon a referral from law enforcement went to the home shared by M.H. and her parents. The parents admitted at the time to using marijuana, and it was subsequently determined that the parents used opiates and cocaine. M.H. was safety-planned into the home of the maternal Grandfather and his wife Christine Hostottle[1] ["Grandmother"].

{¶3} On January 15, 2014, MCCS received a tip that the grandmother was using marijuana and cocaine. An MCCS on call worker performed a urine screen of both grandparents. Grandfather was negative for all substances, but Grandmother was positive for THC. The grandparents were then required to submit to hair follicle testing. Again, Grandfather was negative for all substances, but Grandmother's test was positive for cocaine. At that time MCCS noted the grandparents' youngest child, R.H., then nearly seventeen years old, was not in school. R.H. admitted that he was not enrolled, and had not been so enrolled in the two years that he and grandparents had been residing in Ohio. MCCS requested and was granted protective supervision over R.H. based on Grandmother's positive hair follicle test and the school issue.

---

[1] Christine Hostottle is not a party to this appeal.

{¶4}    On or about January 24, 2014, M.H. was placed in the temporary custody of MCCS.

{¶5}    In February 2014, MCCS prepared a case plan detailing objectives for the parents[2] to complete in an effort to regain custody of M.H.  The case plan was approved by and filed with the Court on February 24, 2014.  The case plan indicated that the placement with Grandfather and Grandmother was terminated due to Grandmother's positive drug screens.

{¶6}    On April 2, 2015, MCCS filed a motion for permanent custody of M.H. On May 4, 2015, Grandfather filed a Motion for Legal Custody of M.H.  By Judgement Entry filed May 11, 2015, the trial court granted Grandfather's pro se motion joining Grandfather as a party.  Grandfather's motion was set for the same time as the hearing on MCCS' motion for permanent custody of M.H.

{¶7}    The Guardian ad Litem ("GAL"), Barbara Caffaratti, filed a report and recommendation on July 29, 2015.

{¶8}    The trial court conducted a hearing was on MCCS' motion for permanent custody and Grandfather's motion for legal custody on August 3, 2015.

*Legal custody / permanent custody hearing.*

{¶9}    The following facts were presented during the trial court's hearing.

{¶10}  The minor child, M.H. had lived with Grandfather and his wife for most of her life, and there was no evidence to suggest M.H. was not properly cared for during that time.  M.H. was four and a half years old when she was taken from her parents in

---

[2] Neither mother nor father is a party to this appeal.

2013, and safety planned to her maternal grandparent's home. During the time of the safety plan, Grandmother tested positive for cocaine and marijuana, and MCCS learned that their seventeen-year-old son, R.H. was not enrolled in school and had not been in school for two years.

{¶11} Caseworker Jennifer Ball testified Grandfather was cooperative with MCCS during M.H.'s safety plan, but when the agency began investigating R.H., Grandfather would not let MCCS into the home. When MCCS returned with protective supervision, they learned that Grandmother and R.H. had moved out of state. Grandfather purchased a two-bedroom trailer in West Virginia where Grandmother and Ryan moved when they left Ohio.

{¶12} Evidence was presented that Grandfather had several interactions with children services in Texas and Florida before moving to Ohio, and then in Ohio before moving to West Virginia. There was a concern that some of these moves were in an attempt to avoid children services.

{¶13} None of Grandfather's three adult children graduated from high school.

{¶14} Upon examination by the Court, Grandfather acknowledged that none of his children completed high school; that he quit school in the twelfth grade but obtained a GED; that Grandmother did not finish high school; that he has not initiated a divorce from Grandmother due to other responsibilities; that he moved to West Virginia in August, 2014; that he has not regularly visited M.H. since then; that he had not filed a motion for visitation before or after being appointed counsel; that he did not know he could have visits separate from the parents on his regular day off.

{¶15} Grandfather further testified in response to questioning by the Court that in 2012 M.H. had been left with a neighbor in Dallas, whom he did not know well, who was a convicted sex offender. The police contacted him and he retrieved M.H. Children's Services then contacted Grandfather a few days later, one time. The family left Texas approximately eight months later. Grandfather also testified that while living in Florida in 2011, Florida Children Services was called by a retaliatory landlord who had disconnected their utilities. This took place as the family was preparing for their move to Texas after Grandfather had sold his business. Grandfather then acknowledged a Texas CSA involvement when M.H.'s mother was in kindergarten. This involvement was the result of allegations against Grandmother. Grandfather testified that he never moved to avoid any children services agency in any state.

{¶16} Grandfather further testified he is employed full time at $10.00 plus monthly attendance bonuses; his longest period of unemployment was three weeks; he has made arrangements for childcare while he is at work; he is able to afford such childcare; that he and his son, R.H. share a two bedroom trailer; that he has never had substance abuse or mental health problems; that he has assumed responsibility for mother's child support payments for M.H.; and he denied not returning MCCS telephone calls.

{¶17} Grandfather testified R.H. was not enrolled in school in Ohio because the State of Florida had lost his records that were necessary for enrollment and that while M.H. was safety planned in his home he never denied access to MCCS.

{¶18} At the conclusion of the hearing, the trial court requested the GAL conduct further investigation of Grandfather and his living situation.

{¶19} The GAL filed a Supplemental Report on August 17, 2015. On August 27, 2015, the hearing on the motions, including the Supplemental Report and recommendation from the Guardian ad Litem was concluded.

***The trial court's decision.***

{¶20} By Judgment Entry filed October 21, 2015, the trial court granted MCCS motion for permanent custody and denied Grandfather's motion for legal custody.

{¶21} The trial court found by clear and convincing evidence that M.H. could not be placed with either parent within reasonable time pursuant to R.C. 2151.414(B)(1) and (E). The trial court related its concerns with Mother, Father, and with Grandfather. Then the trial court found, pursuant to R.C. 2151.414(B)(1) and (D) that it was in the best interest of M.H. that permanent custody is awarded to MCCS.

{¶22} Specifically, the trial court found that Grandfather failed to demonstrate any stability in his life so as to trust his ability to parent M.H. The court noted that Grandfather has three children, none of whom finished or graduated high school; has had children services involvement in several states while his children were minors and under his care and custody; that when M.H. was removed from his custody, MCCS had protective supervision over Grandfather's youngest child, R. H.; that Grandmother tested positive for cocaine and marijuana while M.H. was residing with the couple; that Grandfather demonstrated a lack of cooperation and denied access to his home on several occasions while MCCS had Protective Supervision over R.H.; that Grandfather failed to have regular or consistent contact or visitation with M.H. during her then current placement; Grandfather's October 16, 2014, home study was not approved; and both Guardian ad Litem's reports recommended that he not get custody of M.H.

*Assignment of Error*

{¶23} Grandfather raises one assignment of error,

{¶24} "I. THE DECISION BY THE TRIAL COURT TO DENY THE MATERNAL GRANDFATHER'S MOTION FOR LEGAL CUSTODY AND GRANT PERMANENT CUSTODY TO MUSKINGUM COUNTY CHILDREN'S SERVICES IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE PURSUANT TO R.C. 2151.414."

*Analysis*

{¶25} We begin our analysis by emphasizing that the parents are not party's to this appeal. Instead, the issue before this court is whether the trial court erred when it denied the Grandfather's motion for legal custody of the child. It is well established that relatives seeking custody of a child are not afforded the same presumptive rights that a natural parent receives.

{¶26} Before awarding legal custody to a non-parent, a trial court must ordinarily make a finding that each parent is unsuitable. *In re L.M.,* 2nd Dist. Greene No. 2010–CA–76, 2011–Ohio–3285, ¶ 18 *citing In re Hockstock*, 98 Ohio St.3d 238, 2002–Ohio–7208, 781 N.E.2d 971. This requirement does not apply, however, in cases involving abuse, neglect, or dependency. Id. The Ohio Supreme Court in *In re C.R.* held "[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents." 108 Ohio St.3d 369, 2006–Ohio–1191, 843 N.E.2d 1188, paragraph one of syllabus. Thus, "[w]hen a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding

at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent." *In re L.M.*, supra, 2011–Ohio–3285 *quoting In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 118, paragraph two of syllabus.

**{¶27}** Importantly, the award of legal custody is "not as drastic a remedy as permanent custody." *In re L.D.*, 10th Dist. No. 12AP–985, 2013–Ohio–3214, ¶ 7. *See also In re N.F.*, 10th Dist. No. 08AP–1038, 2009–Ohio–2986, ¶ 9. This is because the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.* 108 Ohio St.3d at ¶ 17, 2006-Ohio-1191, 843 N.E.2d 118. Therefore, since the granting of legal custody does not divest a parent of his or her fundamental parental rights, the parent can petition the court for a custody modification in the future. *In re L.D.*, *supra* at ¶ 7.

**{¶28}** "A trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen*, 129 Ohio St.3d 417, 2011–Ohio–3361, 953 N.E.2d 302, ¶ 14. We review the award of legal custody for an abuse of discretion. *In re L.D. supra* at ¶ 8; *In re Gales*, 10th Dist. No. 03AP–445, 2003–Ohio–6309, ¶ 13; *In re N.F.*, 10th Dist. No. 08AP–1038, 2009–Ohio–2986, ¶ 9, *citing In re Nice*, 141 Ohio App.3d 445, 455, 2001-Ohio-3214, 751 N.E.2d 552 (7th Dist.). Abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶29}** Unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence. *In re S.D.,* 5th Dist. Stark Nos.

2013CA0081, 2013CA0082, 2013-Ohio-5752, ¶ 32; *In re A.C.,* 12th Dist. Butler No. CA2006–12–105, 2007–Ohio–3350, ¶ 14; *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist. 2001).

{¶30} In this type of dispositional hearing, the focus is on the best interest of the child. *In re C.R.*, 108 Ohio St.3d 369, 2006–Ohio–1191, 843 N.E.2d 1188; *In re P.S.,* 5th Dist. Stark No. 2012CA00007, 2012–Ohio–3431. Despite the differences between a disposition of permanent custody and legal custody, some Ohio courts have recognized "the statutory best interest test designed for the permanent custody situation may provide some 'guidance' for trial courts making legal custody decisions." *In re A.F.,* 9th Dist. Summit No. 24317, 2009–Ohio–333, ¶ 7, *citing In re T.A.*, 9th Dist. Summit No. 22954, 2006–Ohio–4468, ¶ 17; *In re S.D.* 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013-Ohio-5752, ¶ 33 .The child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055(1991).

{¶31} A trial court is not required to consider placing a child with a relative prior to granting permanent custody to an agency. *In re Zoms*, Franklin App. No. 02AP-1297, 2003-Ohio-5664, ¶ 28; *In re Turner*, 5th Dist. Stark No.2006CA00062, 2006–Ohio–4906, ¶ 35; *In re Perry*, 4th Dist. Vinton Nos. 06 CA 648, 06 CA 649, 2006–Ohio–6128, ¶ 62. Relatives seeking custody of a child are not afforded the same presumptive legal rights that a parent receives. Id. A trial court does not even need to find by clear and convincing evidence that a grandparent is not a suitable placement option. *In re A.D.*, Cuyahoga App. No. 85648, 2005-Ohio-5441, ¶12. Instead, it is within the trial court's discretion to determine whether to place children with a relative, such as grandmother. *In re Patterson*,

134 Ohio App.3d 119, 129-130, 730 N.E.2d 439(9th Dist. 1999); *In re Poke*, 4th Dist. Lawrence App. No. 05CA15, 2005-Ohio-5226. We will reverse such a decision only upon an abuse of that discretion. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶32}** On review of the evidence in this case and the trial court's decision, we find no error in the court's consideration of the Grandfather's history of involvement with children's services. A relative's past history is a relevant factor for a court to consider when determining whether it is in a child's best interest to grant custody to the relative. *See, e.g., In re E.M.D.R.E.,* 12th Dist. Butler Nos. CA2009–08–220, CA2009–09–222, 2010–Ohio–925; *In re R.E.P.,* 5th Dist. Tuscarawas No. 2011AP050021, 2011–Ohio–5375.

**{¶33}** R.C. 2151.414(D) sets forth factors to be considered in making a determination regarding the best interest of the child. These factors include, but are not limited to, the following:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies

or private child placing agencies for twelve or more months of a consecutive

twenty-two month period ending on or after March 18, 1999;

(4) The child's need for a legally secure placement and whether that type of

placement can be achieved without a grant of permanent custody to the

agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply

in relation to the parents and child.

**{¶34}** In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d

517, the Ohio Supreme Court clarified the standard of review appellate courts should

apply when assessing the manifest weight of the evidence in a civil case. *SST Bearing

Corp. v. Twin City Fan Companies, Ltd.*, 1st Dist. Hamilton No. C110611, 2012–Ohio–

2490, ¶ 16. The Ohio Supreme Court held the standard of review for manifest weight of

the evidence for criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380, 678

N.E.2d 541 (1997), is also applicable in civil cases. *Eastley*, at ¶ 17–19, 972 N.E.2d 517.

A reviewing court is to examine the entire record, weigh the evidence and all reasonable

inferences, consider the credibility of witnesses, and determine "whether in resolving

conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest

miscarriage of justice that the judgment must be reversed and a new trial ordered."

*Eastley*, at ¶ 20 *quoting Twearson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176

(9th Dist. 2001); *See also Sheet Metal Workers Local Union No. 33 v. Sutton*, 5th Dist.

Stark No. 2011 CA00262, 2012–Ohio–3549, *citing State v. Martin*, 20 Ohio App.3d 172,

175, 485 N.E.2d 717 (1st Dist. 1983). "In a civil case, in which the burden of persuasion

is only by a preponderance of the evidence, rather than beyond a reasonable doubt,

evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley,* at ¶ 19.

**{¶35}** The evidence in the case at bar established that M.H. was in Grandfather's home when Grandmother tested positive for controlled substances. (1T. at 48). Grandfather does not dispute this finding. At that time, Grandfather's son, R.H. admitted that he had not been enrolled in school for the past two years. (1T. at 49). Grandfather does not dispute this fact; rather he simply seeks to blame his son's not attending school on the Florida school system, claiming they lost R.H.'s school records. (1T. at 111-113). The caseworker testified that Grandfather would not allow MCCS inside his home after they began investigating R.H. (1T. at 69-70). Grandfather admitted that he denied MCCS access to his home on two occasions. (1T. at 112-113). Grandfather admitted that none of his three children graduated from high school. (1T. at 133). Grandfather admitted to moving between three states before M.H. was four and one half years old. (1T. at 117 - 118). Grandfather admitted that he did not request visitation with M.H. (1T. at 135; 140-141). Further, he had only seen M.H. three times in the past eighteen months. (1T. at 134). Grandfather does not dispute that agencies in Texas and Florida had been involved with his family in the past. (1T. at 165-172).

**{¶36}** The GAL testified to the court on August 27, 2015, and expressed her concerns. She testified that Grandfather admitted that he knew of his wife's drug use, and that children services attempted to find out if the children were in school but could not find any evidence of such. (T. Aug. 27, 20-15 at 9-10). In 2013, children services had been called, and it was discovered that M.H. had been left in the care of a registered sex offender. (Id. at 10) At that time, it was also reported that the Hostottle family, with

the granddaughter M.H., were living in a one bedroom apartment and children services was unable to contact them because they moved.  (Id.)

**{¶37}** In 2014, when MCCS was investigating why R. H. was not in school, Grandmother and R.H. moved to West Virginia.  (T. Aug. 27, 2015 at 11).

**{¶38}** The GAL further testified about her concerns that Grandmother's car was seen in Grandfather's driveway.  Grandfather had 12 different addresses listed in four different states. (Id. at 12).  Children services in Texas suspected that the family moved to avoid them, and there were five moves while Grandfather's family was in Texas.  (Id. at 11-12).  Grandfather admitted to the GAL that M.H. did not recognize him and she continually asked to leave the visitation that occurred on August 7, 2015.  (T. Aug. 27, 2015 at 14).

**{¶39}** "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.  In determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the findings of fact. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Easterly*, at ¶ 21, *citing Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶40}** Accordingly, the trial court's findings are based upon competent, credible evidence presented to the trial court during the evidentiary hearing.  While there may have

been differing testimony on some issues, the trial court, as trier of fact, was in the best position to assess credibility.

**{¶41}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial credible evidence presented that it was not in the best interest of M.H. to grant legal custody to the Grandfather.

**{¶42}** Grandfather's sole assignment of error is overruled.

**{¶43}** Accordingly, the judgment of the Muskingum County Court of Common Pleas, Juvenile Division is affirmed.

By: Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur