[Cite as *In re J.H.*, 2019-Ohio-5184.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| | | JUDGES: |
| IN THE MATTER OF J.H. | : | Hon. W. Scott Gwin, P.J. |
| | : | Hon. William B. Hoffman, J. |
| | : | Hon. Earle E. Wise, J. |
| | : | |
| | : | |
| | : | |
| | : | Case No. 19CA000025 |
| | : | |
| | : | |
| | : | |
| | : | OPINION |

CHARACTER OF PROCEEDING:         Civil appeal from the Guernsey County
                                 Court of Common Pleas, Juvenile Division,
                                 Case No. 17 JC 00304

JUDGMENT:                        Affirmed

DATE OF JUDGMENT ENTRY:          December 11, 2019

APPEARANCES:

For Mother                       For Appellee

MARK PERLAKY                     MELISSA WILSON
232 W. 3rd Street, Ste. 323      274 Highland Avenue
Dover, OH 44622                  Cambridge, OH 43725

*Gwin, P.J.*

{¶1}   Appellant-Mother appeals from the August 1, 2019 judgment entry of the Guernsey County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of J.H. to Guernsey County Children's Services ("GCCS").

*Facts & Procedural History*

{¶2}   On August 1, 2017, GCCS filed a complaint and a motion for emergency temporary custody, alleging J.H., who was born on April 21, 2011, is a neglected child pursuant to R.C. 2151.03(b) and/or (c), and a dependent child pursuant to R.C. 2151.04(b) and/or (c).  The complaint alleges as follows:  GCCS was notified that a drug raid had been conducted at the home of Grandmother, J.H.'s legal custodian; Grandmother was arrested at the scene; officers found crack cocaine and drug paraphernalia in the home that was laying in plain sight and within the reach of the child; officers reported the home was in deplorable condition; Grandmother provided GCCS a name for potential kinship placement, but that person was out of town and unavailable to care for J.H.; the whereabouts of J.H.'s Father are unknown; J.H.'s Mother is incarcerated at the Northeast Pre-Release Center; Grandmother remains incarcerated at the Guernsey County Jail; and J.H. is in need of a safe, stable, and secure living environment.  The trial court issued an ex parte order of custody of J.H. to GCCS.

{¶3}   The trial court held a probable cause hearing on August 1, 2017.  In an August 8, 2017 judgment entry, the trial court found probable cause to believe J.H. is a dependent or neglected child.

{¶4}    Mother filed a motion to be added to the case plan on August 21, 2017.  The trial court held an adjudicatory hearing on October 6, 2017.  In a judgment entry, the trial court found J.H. to be a dependent child pursuant to R.C. 2151.04(C).  Upon request of GCCS, the trial court dismissed the allegations of neglect.  The trial court found reasonable efforts were made by GCCS to keep the child in his own home by looking for kinship placement for the child.

{¶5}    On October 31, 2017, the trial court held a dispositional hearing.  In a November 2, 2018 judgment entry, the trial court added Mother to the case plan, continued the temporary custody of J.H. with GCCS, and found reasonable efforts were made by GCCS to keep the child in his own home.

{¶6}    The trial court held review hearings on January 29, 2018 and April 23, 2018 and issued judgment entries on January 31, 2018 and April 25, 2018 continuing the temporary custody of J.H. with GCCS and finding reasonable efforts were made by GCCS to keep the child in his own home by looking for a kinship placement for the child, providing a safety plan, providing support services, providing mental health services, providing mental health counseling for the child, providing case management, providing financial support for the custodian, and providing visitation with the custodian.  In the January 31, 2018 judgment entry, the trial court also approved the amended case plan dated January 26, 2018.

{¶7}    The trial court held a review hearing on July 19, 2018 and issued a judgment entry on July 25, 2018.  The trial court granted GCCS' motion for extension of temporary custody.  Further, the trial court found GCCS made diligent and reasonable efforts to finalize the permanency plan by working a reunification plan for Mother and Grandmother

and also that GCCS made reasonable efforts to keep the child in his own home by looking for a kinship placement for the child, referrals for services, providing case management, and providing visitation with Grandmother.

{¶8} GCCS filed a motion for permanent custody on October 2, 2018. GCCS the filed a motion to dismiss the permanent custody motion, stating they were exploring recently discovered kinship options. On December 21, 2018, upon the motion of GCCS, the trial court dismissed the motion for permanent custody. GCCS filed a second motion for permanent custody on April 2, 2019. The trial court held a hearing on the motion on July 30, 2019.

{¶9} At the beginning of the hearing, the trial court noted Father failed to appear. Counsel for Father did not know his whereabouts and last had contact with him in November and thus requested the trial court continue the hearing. The trial court denied the motion to continue.

{¶10} Kendra Winland ("Winland") is a case manager and chemical dependency counselor at Cedar Ridge who began working with Grandmother in April of 2018 when Grandmother came for an assessment. Grandmother was diagnosed with anxiety disorder and cocaine abuse. Grandmother did not complete her treatment and was discharged unsuccessfully in October of 2018 because she did not show up for her appointments or respond to the letters sent by the agency. Grandmother took three drug screens while with the agency, in April, May, and June of 2018. She failed all three screens for testing positive for cocaine. Grandmother denied using cocaine and told Winland she must have come in contact with it while cleaning and it was in her home because of her son.

{¶11}   Nancy McIntire ("McIntire"), a counselor with Guernsey County Alcohol and Drug Services, met Grandmother when she came for an assessment on November 6, 2018.  Grandmother was diagnosed with mild cocaine stimulant use disorder and the recommendation from the assessment was individual counseling weekly.  Grandmother did not successfully complete counseling with the agency and her case is open, but in inactive status because of her failure to attend appointments.  Grandmother kept eleven counseling appointments, with the last being on April 8, 2019.  Grandmother took five drug screens when with the agency, two in November of 2018, two in January of 2019, and one in March of 2019.  She tested positive for cocaine in all of the drug screens.  Grandmother denied using cocaine.  McIntire found this concerning because, even though the levels of cocaine in her tests were coming down, McIntire could not start to work with and treat a drug addiction if someone does not admit they have a problem.

{¶12}   Deanne McNerney ("McNerney"), a pretrial bond officer at the Cambridge Municipal Court, monitored Grandmother when she was placed on bond through the court.  The bond conditions included no alcohol, no non-prescribed drugs, and random drug screens.  Grandmother took two drug screens for McNerney, both in April of 2019, and tested positive for cocaine in both screens.  Grandmother failed to appear for drug screens in May of 2019.  McNerney testified Grandmother denied using cocaine despite the positive drug screens.

{¶13}   Kelsey Wolfe ("Wolfe") is the kindship program coordinator at GCCS who looked into several kinship placements for J.H.  Two individuals, L.M. and R.S., never responded to letters or phone calls in June of 2019.  In June of 2019, T.T. expressed interest in adopting J.H. as her family owned a daycare J.H. attended.  Wolfe informed

T.T. that J.H. was not available for adoption, but he was available for a kinship placement and the agency would look into it; however, Wolfe never heard from T.T. after that.  Wolfe testified she very clearly indicated to T.T. that if she was interested in a kinship placement, she should let Wolfe know.  At the request of Mother, in March of 2019, the agency looked into M.H.  However, the agency did not have a working phone number or valid address for M.H.  In January of 2019, the agency explored M.D., but they could not find a valid address or working phone number for her.  They agency explored A.W. in November of 2018.  A.W. lived in Pennsylvania and began the Interstate Compact process, but A.W. ultimately withdrew from consideration in March of 2019.

{¶14}  The agency explored M.R. in October of 2018.  M.R. had an extensive criminal and child welfare history.  Though she reported she had made changes in her life, M.R. had a positive drug screen and thus was removed from consideration in January of 2019.  B.S. was considered in August of 2018, but she would not return phone calls or letters from the agency, so she was removed from consideration in October of 2018.  K.M. was considered in September of 2018, but was denied due to her criminal history and child welfare history.  Also in September of 2018, the agency mailed letters to J.H. and V.H. and did not receive a response to either of the letters.  In June of 2018, M.P.'s name was provided, but she was denied due to her child welfare history.  In March of 2018, J.J. asked to be considered, but ultimately felt she could not handle the child's behavior.

{¶15}  In April of 2018, the agency considered F.H. and J.H., but there were concerns about their health, so Wolfe asked them to complete medical evaluations.  They did not complete any evaluations and were then not considered when Grandmother moved in with them in June of 2018 due to Grandmother's drug use.  The agency

considered D.T. in August of 2017, but she was denied due to her child welfare history. Wolfe testified that D.T. was substantiated as a perpetrator of neglect in 2007.

{¶16} In March of 2019, the agency considered J.S., but he withdrew from the process in April of 2019 due to his wife being in jail for murder and too much family drama going on for him to take the child. J.S. also believed Mother and Father stole his daughter's car. Wolfe testified J.S. contacted the agency the week prior to the permanent custody hearing, but she did not contact him because he has a very extensive violent criminal history that would make it very difficult to place a child in his home. J.S.'s last felony conviction was in 2008. Additionally, J.S. was last involved with the child welfare system in 2015.

{¶17} Wolfe testified that, as of the date of the hearing, there were no approved kinship home studies for J.H.

{¶18} Amanda Kennedy ("Kennedy") is a caseworker at GCCS. J.H. first came into custody of the agency on August 1, 2017 when there was a drug raid at Grandmother's home. Since August 1, 2017, J.H. has been in the continuous custody of GCCS. Grandmother was J.H.'s legal custodian and cared for him for most of his life.

{¶19} Kennedy testified Father basically had no involvement in this case. Kennedy saw him once when he was incarcerated. Since Father was released from prison in February, Kennedy has been trying to find him via public record searches, but has been unsuccessful. Father pled guilty to trafficking in cocaine in 2018. Kennedy has not heard from Father since his release from prison. Father was not on the case plan and did not request to be on the case plan.

{¶20} The case plan objectives for Mother included: complete a drug and alcohol assessment and follow all recommendations; comply with random drug screens at the request of the agency or service providers; complete a mental health assessment and follow all recommendations; complete parenting classes; obtain and maintain stable housing; obtain and maintain enough economic resources to be able to meet the basic needs of her family; and refrain from illegal activity.

{¶21} To Kennedy's knowledge, Mother has not completed a drug and alcohol assessment, a mental health assessment, or parenting classes. Kennedy was only able to get one drug screen for Mother in which she testified positive for amphetamines because she could not locate Mother other than when she was in jail. Mother has seen J.H. a total of three times in the last two years. Mother is currently in the Guernsey County Jail, so Kennedy has been unable to determine her housing situation. Kennedy has no knowledge of Mother ever being employed since 2017. Mother has not refrained from illegal activity, as she has received several charges including criminal trespassing, a probation violation, assault, unauthorized use of a vehicle, theft, aggravated trafficking in drugs, and aggravated possession of drugs. Mother is currently awaiting sentencing on the aggravated trafficking in drugs and aggravated possession of drug charges.

{¶22} Grandmother was also on the case plan in this case. Her case plan objectives included: complete a drug and alcohol assessment and follow all recommendations; complete a mental health assessment and follow all recommendations; random drug screening; participate in J.H.'s mental health services at the request of the counselor; maintain physical living condition in a clean, safe, and sanitary manner free from physical hazards; maintain stable housing and enough

economic resources to meet the daily basic needs of J.H.; and provide the agency with names and contact information for any potential relative placements.

{¶23} Grandmother did complete a drug and alcohol and mental health assessment, however, she failed to follow all recommendations because she was non-compliant with both service providers and had failed drug screens. In addition to those testified to by the other service providers, Grandmother took drug screens for GCCS. Grandmother tested positive for cocaine on: August 17, 2017, August 25, 2017, October 23, 2017, January 10, 2018, January 22, 2018, April 4, 2018, April 17, 2018, April 23, 2018, May 31, 2018, June 25, 2018, August 1, 2018, September 4, 2018, September 18, 2018, September 24, 2018, October 22, 2018, November 13, 2018, November 27, 2018, and January 22, 2019. Grandmother also refused to take several drug screens for GCCS on July 27, 2018, January 8, 2019, January 28, 2019, February 19, 2019, April 9, 2019, April 23, 2019, and May 28, 2019, despite the fact Kennedy told her each time that a refusal to screen would be considered a positive for all substances. To Kennedy's knowledge, Grandmother has never tested negative for cocaine since 2017. Kennedy had several conversations with Grandmother and Grandmother denied using cocaine. When Kennedy visited Grandmother's home, it was cluttered and dirty and the window was busted out during the drug raids. Grandmother now lives with her parents. Grandmother was evicted from her home in May of 2018. Grandmother has not been employed since 2017.

{¶24} With regards to A.W. and the interstate compact agreement with Pennsylvania, Kennedy reached out to A.W. to collect information to complete the ICPC in November of 2018. Kennedy testified the Pennsylvania Kinship Care regulation

required A.W. become a foster parent and they were asking for payment from GCCS. GCCS was unwilling to pay for a foster placement since J.H. already had a foster placement in Ohio and GCCS was looking for a kinship placement. Kennedy did not have any conversations with A.W. after that. Kennedy did not know how long it would have taken A.W. to become a foster parent. A.W. last saw J.H. in 2016. J.S. called Kennedy about placement one week prior to the hearing. J.S. told Kennedy he wanted to be considered again because Mother called him the night before crying.

{¶25} Kennedy believes GCCS made reasonable and diligent efforts to locate a kinship placement for J.H. J.H. was previously in foster care for a short time as a baby. Grandmother visits J.H. regularly. J.H. is bonded to Grandmother and there are no issues with their visits.

{¶26} Kennedy does not believe J.H. could be placed with Father within a reasonable amount of time because he has not had any involvement. Kennedy does not believe J.H. could be placed with Mother within a reasonable amount of time because she had very little involvement with J.H. and she is currently facing felony charges. Kennedy does not believe J.H. can be placed with Grandmother within a reasonable amount of time because she has between 45-50 drug screens in the past two years that have all been positive for cocaine. Neither Mother nor Grandmother has successfully completed their case plan objectives. Kennedy believes GCCS has made reasonable and diligent efforts to finalize a permanency plan for J.H., including referrals for services, case management, visitation, and searches for kinship placement.

{¶27} Kennedy is aware of three drug raids at Grandmother's home, but is not aware that Grandmother has been charged with anything. J.H. is upset that he can't live

with Grandmother. J.H. has been in the same foster home since 2017. J.H. has adjusted well to the foster home and though the foster parent has struggled with J.H.'s behaviors, they are being addressed in counseling.

{¶28} Randolph White ("White") has known Grandmother for fifteen years. J.H. attended church with Grandmother at White's church. White observed a bond between J.H. and Grandmother.

{¶29} Grandmother testified she lives with her parents. Grandmother stated she is trying to do the right thing, including taking care of her parents and making sure J.H. has what he needs. Grandmother has a strong bond with J.H. and visits him every week. Grandmother has not been charged as a result of the drug raids. Grandmother does not have any financial resources right now because her stepfather is ill. Grandmother never had any problems with J.H. while he was in her care.

{¶30} Grandmother stated she stopped going to drug and alcohol counseling because she was hurt and was being defiant. However, she believes she would be cooperative at this point and believes it is in J.H.'s best interest to continue to have contact with her based upon the bond she has had with him.

{¶31} On cross-examination, Grandmother testified at the beginning of the case, she did use cocaine. As to the positive test in April of 2019, Grandmother stated she was in the hospital with pneumonia and, upon being released from the hospital, completed a drug test, so she does not know how she tested positive for cocaine. Grandmother testified she has made plans to go back to counseling and plans on working.

{¶32} Ruthellen Weaver ("Weaver") has been J.H.'s guardian ad litem since she was appointed on August 3, 2017. She filed a report with the court on July 23, 2019. In

her report, Weaver states she believes it is in J.H.'s best interest that J.H. be placed in the permanent custody of GCCS.

{¶33} Weaver did not hear any testimony at the hearing that would cause her to change the recommendation contained in her report. Weaver believes it is in the best interest of J.H. to be placed with GCCS for purposes of adoption. As to the exploration of kinship placements, Weaver feels the agency sufficiently explored kinship options for J.H. Weaver has never before been involved in a case with such a long list of kinship placements that were contacted and the permanent custody first filed in this case was withdrawn so relatives could be pursued before the current permanent custody motion was filed.

{¶34} B.J. Yates ("Yates"), the court appointed special advocate, filed a report on July 23, 2019. She did not hear anything during the hearing that would change her recommendation that granting permanent custody to GCCS is in the best interest of J.H. In her report, Yates recommends permanent custody be granted to GCCS because: adequate time has been given to all parties involved to successfully complete their case plan; Grandmother has been non-compliant with her case plan, as she habitually uses drugs; Mother is frequently incarcerated and fails to work on her case plan; and Father has not been actively involved and after incarceration made no effort to reunify.

{¶35} The trial court issued a judgment entry on August 1, 2019 granting the motion for permanent custody. The trial court first stated that Father was not present and counsel for Father was not aware of his whereabouts and had not had any recent contact with him, despite repeated attempts to contact him. The trial court denied counsel for Father's motion to continue the hearing, nothing that Father is not a participant on the

case plan and has not visited with the child during the entire proceeding. The trial court found J.H. has been in the temporary custody of a public service agency continuously since August 1, 2017, thus for twelve or more months of a consecutive twenty-two month period.

{¶36} As to Grandmother, the trial court found she has consistently tested positive for cocaine throughout the case, even though she continually denies using cocaine. While she claims she must have ingested the drug while cleaning her home and also blamed Father for the positive drug tests despite the fact he was in prison, Grandmother has taken over twenty-six different drug screens and all have been positive for cocaine. She refused to take drug screens eight times with the understanding that a refusal would be considered a positive. The trial court further found Grandmother has not completed any part of her case plan.

{¶37} As to Mother, the trial court found she has not complied with her case plan because she: obtained a drug and alcohol assessment but never returned for counseling; failed to stay in contact with the agency; has not completed a mental health assessment or any parenting classes; has no stable housing; has visited J.H. only twice at the agency in the last two years; continues to involve herself in illegal activities; and is currently incarcerated in the Guernsey County Jail.

{¶38} The trial court found Father has been incarcerated for much of the last two years, did not ask to be placed on the case plan, and has not seen the child at any time in the last two years. The trial court found Mother and Father abandoned the child.

{¶39} The trial court then considered the best interest factors as required by R.C. 2151.414(D)(1). The trial court found the child's interrelationship with Father to be non-

existent because Father has not seen the child in the last two years and has failed to be part of the case plan. Also, the trial court found the child's interrelationship with Mother to be nonexistent because she has only seen the child two times in the last two years, has not worked on her case plan, and has continued to be involved in illegal activities. Grandmother has had a good relationship with J.H., is bonded to him, and she has been the consistent caregiver since J.H. was a baby. However, the trial court found: she has made no progress in her case plan; she cannot even admit she is abusing cocaine despite all the positive drug screens; she failed to attend her counseling or stop her drug use; and has shown an inability to provide a safe, stable, secure environment for J.H.

{¶40} The trial court noted J.H. has been in the same foster home since August 1, 2017 and, while the child has expressed that he wants to live with Grandmother, she has not taken the necessary steps to even consider returning the child to her. While there was much testimony regarding kinship options, the agency has explored over fourteen kindship options in two years and none of the options have been appropriate or approved by the agency.

{¶41} The trial court found a legally secure placement for J.H. cannot be achieved without a grant of permanent custody to GCCS because of: the inability of Mother, Father, or Grandmother to parent the child; the drug use of Grandmother and Mother; lack of follow through with counseling by Mother and Grandmother; lack of stable, safe, and secure housing by Mother and Grandmother; abandonment of J.H. by Father; general lack of cooperation by Mother and Grandmother with GCCS and other service providers; and no appropriate kinship options are available.

{¶42} The trial court found, by clear and convincing evidence, that it is in the best interest of J.H. to terminate the parental rights of Mother and Father, terminate the custodial rights of Grandmother, and grant the motion for permanent custody to GCCS. Further, the trial court determined GCCS made reasonable efforts to prevent the removal, to eliminate the continued removal, or make it possible for J.H. to return home safely to the home of Mother, Father, or Grandmother and this cannot be achieved due to the parties' inability to cooperate with service providers or make a parental commitment to the child.

{¶43} Mother appeals the August 1, 2019 judgment entry of the Guernsey County Court of Common Pleas, Juvenile Division, and assigns the following as error:

{¶44} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING PERMANENT CUSTODY TO GCCS AS GCCS FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT GCCS HAD MADE REASONABLE EFFORTS TO REUNIFY THE CHILD WITH MOTHER, AND THAT AN AWARD OF PERMANENT CUSTODY WAS IN THE CHILDREN'S BEST INTEREST."

I.

*Permanent Custody*

{¶45} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

{¶46} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶47}** Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

**{¶48}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

**{¶49}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents or custodian within a reasonable time or should not be placed with the child's parents or

custodian; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶50} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

*Reasonable Efforts*

{¶51} In the first portion of her assignment of error, Mother contends the trial court abused its discretion in finding GCCS made reasonable efforts to reunify J.H. with Mother. More specifically, Mother argues reasonable efforts to reunify the family in this case were not made by GCCS because several kinship options were either not looked into thoroughly or were simply abandoned for financial issues.

{¶52} No one section of the Revised Code addresses the concept of reasonable efforts. Overall, Ohio's child welfare laws are designed to care for and protect children, "whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit, including: the requirement that the agency prepare and maintain a case plan with the goal to eliminate

the need for the out-of-home placement so that the child can safely return home (R.C. 2151.412) and the burden on the agency to prove it made reasonable efforts to prevent the child's removal (R.C. 2151.419).

{¶53} The agency's duty to use reasonable efforts applies only to efforts to avoid removal of a child from their home or to reunify the child with the family following removal. *In re Warren*, 5th Dist. Stark No. 2007CA00054, 2007-Ohio-5703. As this court has previously stated, "the Department is under no statutory duty to make reasonable efforts to place a child with relatives although relative placement is to be investigated." *Id.*; *In re A.J., B.J., & M.R.*, 5th Dist. Licking No. 14-CA-35, 2014-Ohio-3755

{¶54} While the agency did not have to show reasonable efforts at the permanent custody hearing, to the extent that the trial court relied on R.C. 2151.414(E)(1) at the permanent custody hearing, the court must examine the reasonable case planning and diligent efforts by the agency to assist the parents when considering whether the child cannot and should not be placed with the parent within a reasonable time. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 852 N.E.2d 816. The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock Nos. 5-10-34, 2011-Ohio-1458. The child's health and safety is paramount in determining whether reasonable efforts were made. *In re R.P.*, 5th Dist. Tuscarawas No. 2011-Ohio-5378.

{¶55} The agency offered evidence that it made reasonable efforts to place the child with relatives. Wolfe testified about her extensive work attempting to locate a kinship placement for J.H. Beginning in August of 2017 and up until the hearing in July of 2019,

Wolfe attempted to contact fourteen different family members to try to secure a kinship placement for J.H. Many of the family members never responded to Wolfe's inquiry and several others were ultimately found not to be appropriate due to their criminal history and/or extensive child welfare history. Kennedy stated she believes GCCS made reasonable and diligent efforts to locate a kinship placement for J.H. Weaver feels the agency sufficiently explored kinship options for J.H. and specifically testified that she had never before been involved in a case where such a long list of kinship placements were explored. Further, she stated GCCS withdrew their first motion for permanent custody so further kinship placements could be pursued before the current permeant custody motion was filed. As of the date of the permanent custody hearing, despite GCCS' attempts since August of 2017, there were no approved kinship home studies for J.H.

{¶56} Mother contends that family members J.S. and A.W. should have been explored further by the agency. However, as to J.S., Wolfe testified the agency considered him, but he withdrew from the process in April of 2019 due to his wife being in jail on a murder charge and his assessment that there was too much family drama going on for him to take J.H. When J.S. called the agency a week before the hearing, he told Kennedy he was calling because Mother called him the night before crying. However, J.S. was not an appropriate placement for J.H., as Wolfe testified J.S. has an extensive violent criminal history that would make it very difficult to place a child in his home, with his last felony conviction in 2008, and also has an extensive child welfare history, the last incident being in 2015.

{¶57} As to A.W., GCCS did investigate placing J.H. with her. However, because she lives in Pennsylvania, the requirements for a foster placement and a kinship

placement are such that GCCS would have to pay the State of Pennsylvania for A.W. to become a foster parent and continue to make payments throughout a foster placement. Kennedy testified GCCS was unwilling to do this for a foster placement, as J.H. already has a foster placement and GCCS was looking for a kinship placement. Kennedy did not know how long it would take A.W. to become a foster parent in Pennsylvania and she also noted that A.W. had not seen the child since 2016. A.W. ultimately withdrew from consideration in March of 2019.

{¶58} There is clear and convincing evidence in the record that GCCS made reasonable efforts to reunify J.H. and Mother, and that GCCS did explore the possibility of placing the child with family members.

*Best Interest*

{¶59} In the second portion of her assignment of error, Mother argues the trial court erred in finding an award of permanent custody to GCCS was in the best interest of J.H. Specifically, Mother contends it would be in the best interest of J.H. to have kinship options fully explored.

{¶60} We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

{¶61} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including,

but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. No one element is given greater weight or heightened significance. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

{¶62} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. The willingness of a relative to care for the child does not alter what a court considers in determining permanent custody. *In re Patterson,* 134 Ohio App.3d 119, 730 N.E.2d 439 (9th Dist. 1999); *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991). Accordingly, a court is not required to consider placing a child with a relative prior to granting permanent custody to an agency. *In re M.H.*, 5th Dist. Muskingum No. CT2015-0061, 2016-Ohio-1509.

{¶63} The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schafer*, 11 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532. *In re Schafer* made it clear that a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative

was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at 111.

{¶64} The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist. 1994).

{¶65} We find the trial court did not err in finding that granting permanent custody to GCCS was in the best interest of J.H. The trial court specifically considered the factors as outlined in R.C. 2151.414(D)(1). Additionally, as noted above, GCCS made extensive efforts to obtain a kinship placement for J.H., but, either the relatives failed to respond to GCCS, withdrew from consideration, or were not considered by the agency due to their criminal and/or child welfare history.

{¶66} Kennedy testified it is in the best interest of J.H. for GCCS to have permanent custody of J.H. Mother has only seen J.H. twice in the last three years. While J.H. is bonded to Grandmother and is upset he cannot live with her, Kennedy stated J.H. has adjusted well to the foster home and any behavioral issues are being addressed in counseling. Kennedy does not believe Mother or Grandmother can be a secure placement within a reasonable amount of time because: Mother has had very little involvement with J.H. and is currently facing felony charges; and Grandmother has had between 45-50 drug screens in the past two years that have all been positive for cocaine.

{¶67}  Weaver testified and stated in her report that granting permanent custody of J.H. to GCCS is in the best interest of J.H.  Yates recommends permanent custody be granted to GCCS because:  adequate time has been given to all parties to successfully complete their case plan; Grandmother has been non-compliant with the case plan, as she habitually uses drugs; Mother is frequently incarcerated and fails to work on her case plan; and Father has not been actively involved.

{¶68}  We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to GCCS is in the best interest of J.H. is supported by competent and credible evidence.

{¶69} Based on the foregoing, Mother's assignment of error is overruled. The trial court did not abuse its discretion in granting permanent custody of J.H. to GCCS.

{¶70} The August 1, 2019 judgment entry of the Guernsey County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, Earle, J., concur