[Cite as *In re S.P.*, 2023-Ohio-442.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| S.P. AND M.P. | : | Hon. Patricia A. Delaney, J. |
|  | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
|  | : |  |
|  | : | Case No. 2022 AP 08 0025 |
|  | : |  |
|  | : |  |
|  | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:    Civil appeal from the Tuscarawas County
Court of Common Pleas, Juvenile Division,
Case No. 20JN00231

JUDGMENT:    Affirmed

DATE OF JUDGMENT ENTRY:    February 15, 2023

APPEARANCES:

For - Appellee

JEFF M. KIGGANS
TCJFS
389 16th Street S.W.
New Philadelphia, OH 44663

For - Appellant

JOHN BRECHBILL
203 Fair Ave. N.E.
New Philadelphia, OH 44663

*Gwin, P.J.*

{¶1}   Appellant appeals the July 21, 2022 judgment entry of the Tuscarawas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of S.P. and M.P. to Tuscarawas County Job and Family Services ("TCJFS").

*Facts & Procedural History*

{¶2}   M.P. is the mother ("Mother") of S.P., who was born on April 6, 2016, and M.P., who was born on May 11, 2020.   Mother reports the fathers of children are in Guatemala.

{¶3}   On October 14, 2020, TCJFS filed a complaint for neglect and dependency with regards to S.P. and M.P.  The complaint alleged, in part:  police were called to the home; at the home, the police encountered an intoxicated man who allegedly knew nothing about the children being there; the police determined the children were locked in an upstairs bedroom; the police broke down the door because it was padlocked from the outside and the intoxicated man did not have a key; there were multiple empty beer cans in the room and two opened beer cans within the reach of S.P.; Mother reported she went to the store to get milk, however, this version of events was not consistent with the observed situation; and it appeared Mother and her friends were heading to a lake.

{¶4}   The trial court held an adjudicatory hearing on December 7, 2020.  In a December 18, 2020 judgment entry, the trial court found S.P. and M.P were neglected and dependent children pursuant to R.C. 2151.03 and R.C. 2151.04.  Further, the trial court found TCJFS used reasonable efforts to prevent the removal of the children from

the home.  The trial court granted temporary custody of the children to TCJFS.  Attorney Tara-Wright Timberlake was appointed the guardian ad litem ("GAL") for the children.

{¶5} The trial court conducted a review hearing on March 1, 2021.  In a March 4, 2021 judgment entry, the trial court found it was in their best interest for the children to remain in the temporary custody of TCJFS.  Further, that TCJFS made reasonable efforts to avoid the continued removal of the children.  Specifically, that the caseworker met with Mother monthly, and the agency set up an interpreter to assist with completing the case plan services.

{¶6} TCJFS filed a motion to extend custody for six months on September 3, 2021, requesting that Mother be allowed additional time to complete her case plan.  The trial court granted the motion to extend.

{¶7} The trial court held additional review hearings on April 19, 2021 and October 4, 2021.  In judgment entries after each review hearing, the trial court found TCJFS made reasonable efforts to prevent the continued removal of the children from the home.  The court specifically found these reasonable efforts included:  assisting in case plan services, monitoring Mother's progress, and providing interpreters to assist in the case plan.

{¶8} TCJFS filed a motion for permanent custody of S.P. and M.P. on March 8, 2022.

{¶9} The motion outlined the issues remaining with Mother, including:  failure to meet with her individual counselor since October, refusal by Mother to answer the door or take calls from the individual counselor, serious concerns about Mother's ability to care for the children, Mother's testing positive for alcohol when arriving for visits with the

children, Mother's lack of attachment to the children, Mother's inability to feed or change her children, and Mother's lack of taking responsibility for her actions.

{¶10} On April 6, 2022, Mother filed a motion to extend temporary custody.

{¶11} The trial court held a trial on July 12, 2022 on all pending motions.

{¶12} Malissa Cantarero ("Cantarero") is the ongoing caseworker for S.P. and M.P. The initial concern that led to the removal of the children was a report that the children were left alone in the home, padlocked in a room. When agency staff arrived, the children were in a room with a padlock on the outside of the door. The adult present in the home was extremely inebriated, and stated he did not have a key to the room. He reported that Mother had left with friends; when Mother was interviewed, she stated she was at the store buying milk for the children. Since December 8, 2020, the children have been in the continuous temporary custody of TCJFS, which is more than twelve out of the previous twenty-two months.

{¶13} Cantarero testified as to Mother's case plan. The plan required Mother to: attend and successfully complete parenting classes at an agency approved provider, complete a drug and alcohol assessment and follow recommendations including alcohol and drug screening, complete a psychological assessment at Lighthouse Family Center and follow all recommended treatment, maintain employment, and maintain appropriate housing.

{¶14} Mother has maintained employment throughout the case. Until April of 2022, Mother lived with another family in a house filled with cockroaches. In April of 2022, Mother moved into a nice apartment with her sister with appropriate rooms for the children.

**{¶15}** Mother completed the drug and alcohol assessment on March 18, 2021. Mother was referred to individual counseling, which she initially attended. Mother started with one counselor, but was transferred to another counsel when Mother started the parenting classes because the agency was trying not to overwhelm Mother. The new counselor was able to visit Mother at her home, and the new counselor spoke Spanish. However, Mother did not successfully complete the counseling portion of the case plan because the last contact the counselor had with Mother was in October of 2021.

**{¶16}** Mother underwent saliva drug screening with Cantarero. Mother tested positive for alcohol on November 10, 2021, March 17, 2022, March 31, 2022, April 30, 2022, and July 5, 2022.

**{¶17}** Mother completed the psychological evaluation in the spring of 2021, with the help of a K'iche' interpreter provided by the agency. Mother was diagnosed with other specified personality disorder, detached introverted attachment difficulties, and intellectual disabilities.

**{¶18}** Mother attended Goodwill parenting, but she did not successfully complete the class. Cantarero stated a Spanish interpreter was with Mother during each class and the class curriculum was altered to fit Mother's specific needs, but there were serious concerns as to Mother's ability to provide or care for the children. Specifically, during each class and during the discharge session, Mother maintained that while she did what the complaint alleged, she did not do anything wrong and did not know why the agency was involved.

**{¶19}** Cantarero witnessed visitation between Mother and the children during the parenting classes and during visitation at the agency. Cantarero testified Mother

struggles to interact with the children, and that she has no real attachment to either child. Cantarero does not believe the language barrier has anything to do with her lack of attachment to the children, as Mother would not even hug the children or play with them. At the time of the permanent custody hearing, Mother was not visiting with the children because her visits were suspended due to testing positive for alcohol during visitation.

{¶20} Cantarero noted that the agency has provided interpreters for Mother to complete her case plan. Mother's first language is K'iche', which is a dialect of Spanish or Guatemalan origin. Cantarero speaks Spanish. Cantarero testified Mother understands and speaks Spanish, and she and Mother have had many conversations in Spanish. The two speak in Spanish on a normal and routine basis. However, when there is something Cantarero thinks is very in-depth to discuss, she utilizes the K'iche' interpreter.

{¶21} The agency was not able to provide a K'iche' interpreter for the Goodwill parenting class Mother took. While Mother may have been more comfortable with a K'iche' interpreter, Cantarero believes the agency made reasonable efforts in providing Mother with an appropriate interpreter to complete the case plan services. Cantarero testified that a Spanish interpreter was present at each parenting class and if there was a question the Spanish interpreter did not understand, Mother's cousin, who speaks K'iche', was there at the class to help. Further, when the customary K'iche' interpreter was not available, the agency contacted several interpreter agencies to see if they had a K'iche' interpreter, but none was available.

{¶22} Cantarero believes the agency made reasonable efforts to attempt to put Mother in a position where the children could be reunified with her. The agency provided

all transportation to and from all services, including visitation.  Further, as detailed above, Cantarero believes the agency used reasonable efforts with regard to the interpreters. The agency also gave Mother more time to complete her services through an extension. Cantarero does not believe Mother has remedied the concerns that led to the removal of the children.

{¶23}  Cantarero also testified as to the best interest factors.  She witnessed no bond between the children and Mother.  M.P. is too young to express a preference as to custody, but S.P.'s preference is to remain in the foster home.  Several relatives were explored for placement of the children, but none of them were appropriate.

{¶24}  Aimee Thomas ("Thomas") is a licensed clinical psychologist at the Lighthouse Family Center.  TCJFS arranged for a K'iche' interpreter to be present at Thomas' evaluation of Mother. Thomas stated that, even with the K'iche' interpreter, Mother had issues with verbal comprehension.  Thomas believes this was due to Mother's intellectual disabilities.  Thomas has serious concerns about Mother's ability to parent a child due to attachment difficulty, lack of a support system, and intellectual disabilities.

{¶25}  Due to the language barrier, there was a portion of the test Thomas conducted in which language was not necessary.  Mother had great difficulty with this portion of the test.  Thomas did not have Mother take any written tests, but did ask her questions via the interpreter.  When asked whether the results of her testing are skewed because English words do not always translate directly into K'iche', Thomas stated that, with regards to the intelligence testing, Thomas used pictures.  While Mother could understand Thomas' instructions to match the easier set of pictures, Mother was unable to match the pictures when the questions became more difficult.  Thomas confirmed on

cross-examination that the language barrier, or the fact that some English words do not directly translate into K'iche', did not impact Mother's ability to successfully complete this portion of the test because it is not language-based. Thomas agreed that for the portion of the test that relies solely on language, the results may be less accurate than when evaluating an English-speaking parent. Though Thomas was not aware of whether an interpreter was used at the parenting classes, she opined that the availability of an interpreter utilizing Mother's language could impact her ability to do well in parenting class, depending upon how much Spanish Mother was familiar with.

{¶26} Jennifer Fire ("Fire") is the supervisor at Goodwill parenting. Fire testified to the accommodations they provided to Mother. For the language barrier, they worked with an interpreter. The interpreter spoke into a headset microphone and Mother had earbuds to hear the interpretation. Fire was aware the interpreter spoke Spanish rather than K'iche'. Fire stated they did a lot of checking and rechecking of Mother's comprehension of their questions and materials. Further, if Mother stated or appeared to not understand a question, her cousin, who was also in the parenting class, was able to assist. Fire remembered only two-or three-times Mother indicated she did not understand something during the parenting classes. To accommodate Mother's cognitive abilities, they wrote the program goals according to her cognitive abilities and worked privately with her, for upwards of six hours outside of class time, to complete her goals. Additionally, during testing and during visitation, they used pictures to help Mother comprehend rather than words.

{¶27} Fire testified that, during a majority of the parenting classes, Mother fell asleep. Fire woke her in the middle of class on multiple occasions, and a few minutes

later, Mother was back asleep.  Mother also took the earbuds out of her ears on multiple occasions.

**{¶28}**  Fire has concerns about Mother's ability to parent and to problem-solve. She also has concerns about Mother's ability to provide for the very basic needs of the children.  For example, M.P. cannot have dairy.  Fire printed out pictures and explained to Mother that M.P. could not have dairy.  Despite this, Mother would try to give her dairy during the visits.  Mother was not able to provide an appropriate size of food items for the children during the visits, and was unable to provide the food at a proper temperature to the children.  Mother had a total of twelve visits that were two hours long.  Mother was never able to provide for the children's basic needs for these two hours, even as the visits progressed.  Fire and her staff had to help Mother during each visit.  Fire stated Mother did not progress at all during the visits and she was still having the same problems from the first visit to the last visit.  Fire did not observe any kind of bond between Mother and the children.  Fire testified Mother did not appear to want to bond with her children, as she struggled to even look at the children or communicate non-verbally with them.

**{¶29}**  Fire believes TCJFS did everything they could to accommodate Mother's language barrier and intellectual barriers.  While Fire testified it was possible that using a Spanish interpreter instead of a K'iche' interpreter hindered Mother's capacity to learn what she was being taught, Fire believes the modeling of desired parenting behavior by Fire and her staff obviated the language barrier issue because Fire and her staff showed Mother specifically what they wanted her to do.  For example, Mother did not know how to get the child out of the high chair.  Fire showed her exactly how to get the child in and out of the high chair, but Mother still could not complete the task at the next visit.

{¶30} Leyla Pellicier ("Pellicier") is a counselor at Ohio Guidestone. Pellicier got the impression Mother understood Spanish when Pellicier spoke it to her. After her first session with Mother, Mother cancelled the next two counseling sessions, and never called Pellicier again. After the cancellation in November, Pellicier went to Mother's home on January 3, January 5, January 18, February 1, and February 2, in attempts to contact Mother. No one came to the door.

{¶31} The GAL recommends permanent custody be granted to the agency. She observed one visit, and thought Mother was engaged with the children. However, as the visits were possibly improving, Mother started testing positive for alcohol when she arrived for the visits. When asked if she opposed Mother's motion for an extension of temporary custody, the GAL testified that she does not know what that would accomplish since Mother continues to test positive for alcohol when she shows up for visits. Further, when asked if Mother had additional parenting classes and a K'iche' interpreter, would Mother be in a better position to make progress, the GAL stated, "I don't think that would change anything, based on her lack of physical interaction with them, but I cannot speak for sure."

{¶32} Mother stated she grew up in a small village in Guatemala. Mother testified it is very hard for her to communicate with S.P. because S.P. only speaks English. Mother fell asleep during the parenting classes because she works the night shift. Mother stated the alcohol found at the home during the initial removal of the children was not her alcohol. Mother loves her children and wants them back. She believes she could have done better at the parenting classes with a K'iche' interpreter.

{¶33} The trial court issued a judgment entry on July 21, 2022.

**{¶34}** The trial court found S.P. and M.P. have been in the temporary custody of TCJFS for more than twelve months of a consecutive twenty-two-month period. Further, that the children cannot be placed with either parent within a reasonable amount of time. The trial court stated the efforts made by TCJFS were reasonable and diligent in attempting to remedy the problems which caused the removal of the children.

**{¶35}** The trial court stated it considered the best interest factors contained in R.C. 2151.414, and found it is in both S.P. and M.P.'s best interest to grant permanent custody to TCJFS.

**{¶36}** Mother appeals the July 21, 2022 judgment entry of the Tuscarawas County Court of Common Pleas, Juvenile Division, and assigns the following as error:

**{¶37}** "I. THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO JOB AND FAMILY SERVICES IN THAT THE COURT'S 'REASONABLE EFFORTS' FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

*Permanent Custody*

**{¶38}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray,* 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

**{¶39}** Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy

the requisite degree of proof." *Id.* at 477.  If some competent and credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶40}** Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact.  *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).  Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well."  *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159 (1997).

**{¶41}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody.  R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency.

**{¶42}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or

more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶43}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

I.

**{¶44}** In her assignment of error, Mother argues the finding that the children cannot or should not be placed with her within a reasonable time is error because the trial court's "reasonable efforts" finding was against the manifest weight of the evidence.

**{¶45}** We first note that the trial court determined, pursuant to R.C. 2151.414(B)(1)(d), the children have been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. Cantarero testified the children were placed into the temporary custody of TCJFS on December 8, 2020 and were continuously in the temporary custody of the agency until July 12, 2022, the date of the trial. Thus, the children have been in the custody of the agency for more than twelve out of the last twenty-two months.

**{¶46}** As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805. This finding alone, in conjunction with a best interest finding, is sufficient to

support the grant of permanent custody. *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008-Ohio-5458.

{¶47} Because Mother has not challenged the twelve of the twenty-two-month finding or the best interest determination, we would not need to address the merits of Mother's claims with regards to the trial court's determination that S.P. and M.P. could not or should not be placed with Mother within a reasonable time. However, even if we consider Mother's argument, the trial court did not commit error in determining the children cannot be placed with Mother at this time or within a reasonable period of time. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (6) exist.

{¶48} A review of the record supports the trial court's conclusion that the children cannot be placed with Mother within a reasonable time. Mother was terminated from individual counseling because she did not contact the counselor for months, and failed to answer the door when the counselor came to Mother's house on several occasions. Mother tested positive for alcohol multiple times during the pendency of the case, and had her visits suspended because she tested positive for alcohol at several visits. At the time of the trial, Cantarero testified Mother still did not understand what she did wrong or why the agency was involved. Mother demonstrated no attachment to either child. Fire testified that Mother cannot provide for the very basic needs of her children. Further, that, even after twelve visits with the children, Mother was never able to provide for the children's basic needs during the two-hour visits, and staff had to help at each visit. The

same issues Mother struggled with during the first visit were the same issues Mother struggled with at the twelfth visit.

{¶49} Mother's primary argument is that TCJFS did not make "reasonable efforts" to assist Mother in remedying the problems leading to the removal of the children. Specifically, Mother contends TCJFS did not provide her with appropriate interpreters in her primary-speaking langue of K'iche'.

{¶50} First, the Ohio Supreme Court has held the trial court is not obligated by R.C. 2151.419 to make a determination that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816; *In the Matter of L.J.*, 5th Dist. Licking No. 2019 CA 0079, 2019-Ohio-5231. The trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816; *In the Matter of L.J.*, 5th Dist. Licking No. 2019 CA 0079, 2019-Ohio-5231.

{¶51} In this case, the trial court previously made findings of reasonable efforts at hearings held on December 7, 2020, March 1, 2021, April 19, 2021, and October 4, 2021. Consequently, the agency did not need to prove at the permanent custody hearing that it made reasonable reunification efforts. *Id.*

{¶52} Further, we find there is competent and credible evidence to confirm TCJFS made reasonable efforts to assist Mother in eliminating the need for the continued removal of the children. Mother contends the efforts of TCJFS were not reasonable because the agency did not provide Mother with a K'iche' interpreter at every parenting class and for other required case plan services. We disagree. Cantarero testified Mother's individual counselor spoke Spanish. Despite this, Mother failed to contact her for months, and refused to answer the door when the counselor attempted to visit her home. Pellicier stated in the one meeting she did have with Mother, Mother understood Spanish when Pellicier spoke it to her.

{¶53} While Cantarero acknowledged Mother might have been more comfortable with a K'iche' interpreter at the parenting class, Cantarero still believes the agency made reasonable efforts with regard to providing an interpreter. First, the agency contacted several agencies, but no K'iche' interpreters were available. Second, the agency provided Mother with a Spanish interpreter at every parenting class. Fire testified she and the staff continually checked with Mother to see if she understood the Spanish interpreter. Further, if there was something Mother did not understand in Spanish, Mother's cousin, who was also taking the parenting class, was available to assist. Additionally, staff at Goodwill parenting worked privatively with Mother to accommodate the language barrier and her cognitive abilities, with upwards of six hours spent with Mother outside of class time.

{¶54} Further, during the visits with her children, Fire and the staff would model the type of parental behavior they wanted Mother to do. For example, Fire would show Mother how to properly take M.P. in and out of the high chair each week. Fire testified

this obviated the language barrier, as she and the staff specifically showed Mother what to do. Despite this, Mother struggled to communicate non-verbally. After twelve visits, Mother was never able to provide for S.P. or M.P.'s basic needs during those two-hours visits, and staff had to help her at each visit. Fire testified the agency did everything they could to accommodate Mother's language barrier.

{¶55} Cantarero herself speaks Spanish, and stated she and Mother had many conversations in Spanish that Cantarero believes Mother understood. Cantarero only felt a K'iche' interpreter was necessary when very in-depth conversations occurred, but this was not on a normal or routine basis. Cantarero testified she does not believe the language barrier has anything to do with Mother's lack of attachment with the children, as Mother would not even interact with them in non-verbal ways such as hugging or playing with them.

{¶56} The agency did provide Mother with a K'iche' interpreter during her assessment with Thomas. Mother had great difficulty completing the portion of the test where language was not necessary. Thomas testified the fact that some English words do not translate directly into K'iche' did not impact Mother's ability to complete this portion of the test because it was not language-based, and she used only pictures.

{¶57} The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In the Matter of J.H.,* 5th Dist. Guernsey No. 19CA000025, 2019-Ohio-5184. We find there is competent and credible evidence to support the trial court's determination that TCJFS' efforts were reasonable and diligent under the circumstances of the case.

{¶58} Based on the foregoing, Mother's assignment of error is overruled.

{¶59} The July 21, 2022 judgment entry of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur