[Cite as *In re S.P.*, 2025-Ohio-765.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| | : | JUDGES: |
| IN THE MATTER OF: | : | Hon. Craig R. Baldwin, P.J. |
| | : | Hon. Kevin W. Popham, J. |
| S.P. | : | Hon. David M. Gormley, J. |
| | : | |
| | : | |
| | : | Case No. 2024CA00201 |
| | : | |
| | : | |
| | : | |
| | : | OPINION |

CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of Common Pleas, Family Court Division, Case 2023JCV01134

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     March 6, 2025

APPEARANCES:

For Appellee - SCDJFS

BRANDON J. WALTENBAUGH
Stark County JFS
402 2nd St. SE
Canton, OH 44702

For Appellant - Mother

BRIANNA R. BROTHAG
201 Cleveland Ave. S.W., Suite 104
Canton, OH 44702

*Popham, J.,*

{¶1}   Appellant appeals the November 15, 2024, judgment entry of the Stark County Court of Common Pleas, Family Court Division, terminating her parental rights and granting permanent custody of S.P. to Stark County Job and Family Services ("SCJFS").

*Facts & Procedural History*

{¶2}   A.K. is the mother ("Mother") of S.P., who was born on November 3, 2012. S.P. is the father ("Father") of S.P.

{¶3}   On October 5, 2023, SCJFS filed a complaint for dependency and neglect with regards to S.P.  The complaint alleged, in part:  SCJFS first became involved with Mother in March of 2023 when she was homeless and SCJFS paid for a hotel, but the case was closed when Mother stopped cooperating with the agency; in June of 2023, it was reported that Mother and her boyfriend were sleeping in a garage and their children were sleeping in the breezeway of the boyfriend's parents' home; the children were not allowed to go inside to use the bathroom; the boyfriend's Mother was intoxicated and pushed one of the children; Mother confirmed the children were living in the breezeway and that her boyfriend's mother was aggressive; Mother took S.P. to live with her maternal great-grandmother in Pennsylvania; the agency closed that case because great-grandmother was supposed to file for custody in Pennsylvania; in September of 2023, it was reported to the agency that S.P. was living with a family of one of her sibling's friends; the family had not heard from Mother since May of 2023 and the family was struggling to obtain medical attention and mental health treatment for the child; it was reported to the agency that Mother was using methamphetamines; the caseworker met with Mother in

October of 2023; Mother admitted to being homeless and stated she considered checking herself into a mental hospital; Mother tested positive for amphetamines and methamphetamines; Mother threatened to leave the state with her children; and Mother texted the caseworker that, "if I can't have my kids I'm not gonna live."

{¶4} The trial court held a shelter care hearing and placed S.P. in the temporary custody of the SCJFS on October 6, 2023. Mother appeared at the hearing, and stipulated to probable cause. The trial court held a hearing on November 1, 2023. The paternity of S.P. was not yet established, so two potential fathers were discussed at the hearing.

{¶5} The trial court held an adjudicatory hearing on December 7, 2023. In a December 8, 2023, judgment entry, the trial court found S.P. was a dependent child. Further, the trial court found SCJFS took reasonable steps, on three separate occasions, to prevent the removal of the child and to assist Mother in providing safe and appropriate housing for the child. The court continued placement of the child with SCJFS. The court also adopted and approved the case plan.

{¶6} The trial court held dispositional review hearings on April 4, 2024, and September 3, 2024. In judgment entries issued after each of these hearings, the trial court found SCJFS made reasonable efforts to finalize the permanency plan in effect. In June of 2024, the paternity of S.P. was established.

{¶7} SCJFS filed a motion for permanent custody of S.P. on August 20, 2024. The motion outlined the issues remaining with Mother and Father, including: Mother has not completed either a parenting evaluation or a substance abuse evaluation; Mother has not submitted to any of the random drug screens required through the agency's color

code system; when Mother did submit to random drug tests by the caseworker, she tested positive for methamphetamines on October 7, 2023, March 26, 2024, and August 7, 2024; Mother has not engaged in any mental health treatment even though she told the caseworker she has borderline personality disorder; Mother is homeless and sleeps either in her car or in a hammock in the woods; Mother is unemployed; Mother has three other children not in her care; Father did not show for his meeting with the caseworker and had no further contact; S.P. has not seen Father in over four years; Father lost custody of another child in Stark County; and Father has previous issues with substance abuse.

{¶8}    The trial court conducted a trial on SCJFS' motion for permanent custody on November 13, 2024.

{¶9}    Jessica Thomas ("Thomas") was the caseworker assigned to S.P. from January 1, 2024, until October 30, 2024. Thomas testified the initial concerns that led to the filing of the complaint were Mother's homelessness, inability to provide for the basic needs of the child, and substance abuse concerns.

{¶10}   Thomas testified to Mother's case plan and her progress on the case plan. Mother's case plan objectives included a substance abuse assessment and follow all recommendations, a parenting assessment and follow all recommendations, compliance with the agency's color code drug screen system, and finding safe and stable housing for the child. Thomas testified Mother did not complete a substance abuse assessment. Mother did complete one session for the parenting evaluation in August after the motion for permanent custody was filed. However, Mother never made another appointment to complete the assessment. Further, Mother was non-compliant with the color code system. The agency did randomly drug screen Mother several times, and she tested

positive for methamphetamines each time (October 27, 2023, March 26, 2024, and August 7, 2024).

{¶11} Thomas had concerns for Mother's mental health because Mother told Thomas she had previously been diagnosed with borderline personality disorder. Mother indicated to Thomas on several occasions that she wanted to seek out mental health treatment, but she never did.

{¶12} Prior to the agency formally being involved in the case, Mother was living with her children in the breezeway of her boyfriend's parents' home. After that, Mother was homeless. She slept in her car or in the woods. Thomas believes that in September or October of 2024, Mother went into a homeless shelter.

{¶13} Thomas spoke with Father once after he established paternity of S.P. He indicated he wanted to visit S.P. and work on a case plan. However, after that initial conversation, Thomas was never able to successfully contact him. Father failed to attend a meeting he and Thomas had scheduled to discuss a case plan. Father has not seen S.P. for over four years. Father lost custody of another child and told Thomas he had an extensive substance abuse history.

{¶14} Mother visited S.P. consistently at the agency. The visits were bi-weekly for two hours. Thomas believes S.P. has a bond with Mother, but it is more akin to a friendship. During the visits, Mother frequently ignored S.P. and did not actively participate in the visitation.

{¶15} Thomas testified Mother did not make significant progress on her case plan, and Father has abandoned S.P. Thomas does not believe either Mother or Father is able to provide an adequate permanent home for S.P. and neither parent has remedied the

conditions that caused S.P. to be placed outside of the home. Thomas also testified the agency made reasonable efforts to finalize the permanency plan.

{¶16} On cross-examination, Thomas testified that homelessness was only one concern that led to initial agency involvement, and substance abuse and mental health were also major issues.

{¶17} Mother informed Thomas she is on prescription medication for ADHD, but Mother never provided Thomas with a prescription. Thomas testified Mother signed a release of information and provided the name of a doctor in Pennsylvania. Thomas attempted to locate the doctor, but it "appears that doctor doesn't exist." Mother told Thomas the name of the doctor and the general area in Pennsylvania where the doctor was located. However, Thomas could not find a doctor in Pennsylvania with that name, and Mother was unwilling or unable to provide Thomas with any further information. The agency consulted Forensic Fluids, who stated there was only a low possibility that the particular medication Mother stated she was taking would appear on a drug test as methamphetamine. It is highly unlikely from the levels indicated on the tests Mother took it would be anything other than methamphetamine. Thomas asked Mother many times to show her either a prescription or a prescription bottle for the ADHD medication, but Mother never provided Thomas with one.

{¶18} Thomas provided Mother with different landlords within the county who provide low-income housing and provided phone numbers for government assistance like Medicaid. When asked why the agency could not provide any additional assistance, Thomas testified the agency is unable to apply for housing for Mother, she has to do that

for herself. Mother repeatedly told Thomas she was working with the Homeless Hotline and doing what she needed to do, and never asked Thomas for help.

{¶19} Thomas testified the parenting evaluation was made part of the case plan because of Mother's admission to the agency that she had mental health issues. Thomas did not receive any reports of Mother receiving treatment or care for mental health or ongoing ADHD treatment during the case. While Mother did not ask Thomas to refer her to a counselor, Thomas gave Mother the names of many agencies and encouraged Mother to obtain assistance, but Mother never followed up.

{¶20} Thomas also testified during the best interest portion of the trial. S.P. is in mental health counseling and is diagnosed with PTSD. When S.P. was first removed from Mother's care, she was placed in the same foster home as her brother, C.K. However, S.P. was removed from the first foster home because the foster mother reported S.P. was aggressive and saying inappropriate things to other children in the home. S.P. is now in a new foster home and is doing well. S.P. has phone contact with three of her other siblings who are each placed with their biological fathers. S.P. has stated she does not want to be adopted, and the foster parents want to respect her wishes. However, the foster family is willing to provide a long-term placement for S.P. and thinks S.P. may change her mind about adoption. S.P. has built a bond with her foster parents and foster siblings. S.P. has gone to all her medical appointments and is doing better in school.

{¶21} Mother speaks with S.P. on the phone and the foster family is willing to continue the phone relationship with Mother. S.P. does not want to be adopted because she is afraid to be abandoned. S.P. told Thomas that if Mother was not using

methamphetamine, had a home, and did not have inappropriate boyfriends, she may want to go back with Mother. However, since S.P. has been in her current foster placement, she expressed a desire to stay there forever.

{¶22} Thomas has talked with several members of S.P.'s family, particularly the maternal great-grandmother. However, due to her physical health and age, she is unable to care for S.P. Thomas sent out many family engagement letters and she has spoken to some distant relatives, but none of them were willing or able to take care of S.P.

{¶23} Thomas testified that while Mother does visit S.P. and there is a bond between them, any damage that would occur from severing that bond between them would be outweighed by the benefits of permanency. Thomas believes it is in the best interest of S.P. for the court to grant permanent custody to the agency to give S.P. a sense of permanency and a stable home. Thomas does not believe an extension of time would be in the best interest of S.P. because she is ready for permanency.

{¶24} On cross-examination, Thomas testified there is a bond between Mother and S.P. However, the bond is more like a bond between friends. This is because Mother does not actively parent. The times when S.P. is engaged at the visits is when great-grandmother visits with Mother. Thomas believes the child should maintain contact with her great-grandmother, and the foster family is willing to facilitate this contact.

{¶25} Thomas does not believe a six-month extension would be good for S.P. because this would result in continued uncertainty for her.

{¶26} Chelsea Weigand ("Weigand") is the SCJFS supervisor who was assigned to S.P. throughout the case, and took over as the primary caseworker on November 1, 2024, due to Thomas ending her employment with SCJFS. In November of 2024,

Weigand received a final report from Summit Psychological. The evaluator made provisional diagnoses, but could not complete a full report because Mother only attended one appointment. Typically, an evaluation requires two or three sessions. The provisional diagnoses for Mother were: other specified personality disorder with anti-social and borderline traits, severe cannabis use disorder, and severe amphetamine type substance abuse disorder. The recommendations made by the evaluator were: substance abuse treatment, housing stability, and financial stability. A parenting assessment would likely have been recommended, but it was not formally recommended due to the lack of information obtained during the one appointment with the evaluator. Weigand testified the results in this report do not change her or the agency's opinion on permanent custody.

{¶27} Weigand was not able to go over the report with Mother because it was received sometime during the week prior to the hearing. Since November 1, 2024, Mother has not completed a substance abuse assessment, has continued to be non-compliant with the color code drug screening, has not engaged in any mental health treatment, is unemployed, and is living in a homeless shelter. Weigand testified Mother has not made any substantial progress on her case plan, and the same concerns that existed in October of 2023 still exist today.

{¶28} On cross-examination, Weigand testified Mother never provided her a prescription for ADHD medication. Weigand also confirmed Mother was consistent in her bi-weekly visitation.

{¶29} At the conclusion of the first portion of the permanent custody hearing, counsel for Mother made an oral motion for a six-month extension of temporary custody so Mother could work on her case plan. The trial court denied the motion.

{¶30} The guardian ad litem, Mary Lou Sekula ("Sekula") offered her report during the best interest portion of the trial. She additionally offered several comments during the hearing, stating it was in the best interest of S.P. for permanent custody to be granted to the agency. S.P. described to Sekula how when she was with Mother, she did not attend school, she did not have a bed, and she did not have a shower or toilet. S.P. now has stability.

{¶31} The trial court issued a detailed judgment entry containing findings of fact and conclusions of law on November 15, 2024. The trial court found Mother failed continuously and repeatedly to substantially remedy the conditions that caused S.P. to be placed outside the home and Father abandoned S.P.; therefore, there is clear and convincing evidence S.P. cannot be placed with either parent within a reasonable time, nor should S.P. be placed with either parent. Further, the trial court found it is in the best interest of S.P. for permanent custody to be granted to SCJFS. Additionally, any harm caused by severing the bond with Mother is outweighed by the benefits of permanency.

{¶32} Mother appeals the November 15, 2024, judgment entry of the Stark County Court of Common Pleas, Family Court Division, and assigns the following as error:

{¶33} "I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES AS THE AGENCY FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT

GROUNDS EXISTED FOR PERMANENT CUSTODY AND SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶34} "II. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES AS THE AGENCY FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT IT IS IN THE BEST INTERESTS OF THE MINOR CHILD TO GRANT PERMANENT CUSTODY AND SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

*Permanent Custody*

{¶35} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

{¶36} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* If some competent and credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶37} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal Co., Inc. v. Cleveland*, 10

Ohio St.3d 77 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997).

{¶38} R.C. 2151.414 sets forth guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice of the filing of a motion for permanent custody of a child.

{¶39} Following the hearing, R.C. 2151.414(B) authorizes the court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, has not been in the temporary custody of the children services agencies for twelve or more months of a consecutive twenty-two month period, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶40} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court

will usually determine whether one of the circumstances delineated in R.C. 2151.414(B)(1)(a) through (e) is present before proceeding to a determination regarding the best interest of the child. In this case, as to Mother, the trial court made a finding pursuant to R.C. 2151.414(B)(1)(a) (reasonable time).

*Manifest Weight*

{¶41} In both of her assignments of error, Mother argues the trial court's decision was against the manifest weight of the evidence. On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [or decision] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶42} Because the finder of fact is in the best position to weigh the credibility of the witnesses and observe their demeanor, a reviewing court will always be mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 2012-Ohio-2179.

I.

*Reasonable Time / Remedy Agency's Concerns*

{¶43} In her first assignment of error, Mother makes four separate arguments. First, she contends the elements of R.C. 2151.414(B)(1)(a) were not met and thus, the trial court's finding pursuant to R.C. 2151.414(B)(1)(a) was against the manifest weight of the evidence. Second, in conjunction with her first argument, Mother argues the trial

court committed error in finding Mother failed continuously and repeatedly to substantially remedy the agency's concerns.

{¶44} Pursuant to R.C. 2151.414(E), the trial court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The statute also specifically provides that if the trial court determines, by clear and convincing evidence, at a hearing, that one or more of the factors listed in (1)-(15) exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S.*, 75 Ohio St.3d 95 (1996).

{¶45} At issue in this case is R.C. 2151.414(E)(1) which provides as follows: Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those concerns, the court shall consider parental utilization of medical, psychiatric, psychological, and other social rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶46}  In this case, the trial court found that, despite reasonable case planning and diligent efforts by the agency to assist Mother in remedying the problems that initially caused the child to be placed outside the home, Mother has failed to continuously and repeatedly to substantially remedy the conditions causing S.P. to be placed outside the home.  A review of the record supports the trial court's conclusion.

{¶47}  Thomas testified the initial concerns that led to the filing of the case still exist.  Mother still is homeless, living in a shelter, has no suitable place for S.P. to live, is unemployed, still has a substance abuse issue, continues to test positive for methamphetamines, and never addressed her mental health concerns.  Weigand also testified the same concerns that existed in October of 2023 exist today.  At the time of the hearing, Mother had not made any substantial progress on her case plan.  The testimony by Thomas and Weigand demonstrates the trial court did not clearly lose its way or create such a manifest miscarriage of justice that the decision must be reversed and a new trial ordered.

{¶48}  Mother argues that since she had recently addressed the "main" issue of concern by the agency, i.e., her homelessness, the trial court's finding was against the manifest weight of the evidence.  First, though Mother is in a homeless shelter, she did not provide any information as to how this would be a safe and stable environment where S.P. could live on a permanent basis.  Additionally, as testified to by Thomas, homelessness was only one concern the agency had.  Even if the homelessness issue had been resolved (which it was not), Thomas testified Mother still had not substantially completed her case plan or remedied the concerns that led to S.P.'s removal from the home because there were still major concerns about Mother's mental health and her

continued substance abuse. Mother failed to complete any color code drug screens and tested positive for methamphetamines each time a caseworker was able to randomly drug screen her.

{¶49} Further, this Court has recognized that even where a parent has participated in his or her case plan and completed most or all of the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement. *In the Matter of L.D.*, 2018-Ohio-3380 (5th Dist.). A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the ultimate question under R.C. 2151.414 is whether the parent has substantially remedied the conditions that caused the child's removal. *In re A.R.*, 2023-Ohio-1359 (5th Dist.). As detailed above, Mother has not substantially remedied the conditions that caused S.P.'s removal from the home.

*Reasonable Efforts*

{¶50} Mother suggests the agency did not make reasonable efforts to assist her in remedying the problems leading to the removal of the child; thus, the motion for permanent custody should be denied.

{¶51} First, the Supreme Court of Ohio has held the trial court is not obligated by R.C. 2151.419 to make a determination that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing. *In re C.F.*, 2007-Ohio-1104; R.C. 2151.419. The trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for

abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *Id.* at ¶ 41; *In the Matter of L.J.*, 2019-Ohio-5231 (5th Dist.).

**{¶52}** In this case, the record reflects the trial court made reasonable-efforts findings at various points throughout the case, as demonstrated in judgment entries after the hearings held on December 7, 2023, April 4, 2024, and September 3, 2024. Consequently, the agency did not need to prove at the permanent custody hearing that it made reasonable reunification efforts. *Id.*

**{¶53}** In its November 15, 2024, judgment entry, the trial court found the agency made reasonable case planning and diligent efforts to reunify the family. Mother contends the efforts of SCJFS were not reasonable because they only provided Mother with phone numbers and did not actually find housing or mental health treatment for her. We find there is competent and credible evidence to confirm that SCJFS made reasonable case planning and diligent efforts to reunify the family and eliminate the need for the continued removal of the child.

**{¶54}** Thomas testified to the case planning and diligent efforts made by SCJFS. The agency established a case plan and notified Mother of its requirements. Additionally, the agency put Mother on the color code drug testing system for her to demonstrate she was substance-free. Mother was completely non-compliant with the color code system. When Mother told Thomas she tested positive for methamphetamines due to ADHD medication, Thomas attempted to locate the doctor in Pennsylvania, even though Mother could only provide her with a name and a general area in which he was located rather

than produce a prescription or a pill bottle.  Thomas also provided Mother with housing information and the names of counselors for mental health treatment.

**{¶55}**  The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case.  *In the Matter of J.H.*, 2019-Ohio-5184 (5th Dist.).  We find there is competent and credible evidence to support the trial court's determination that SCJFS' efforts were reasonable and diligent under the circumstances of the case and the trial court did not lose its way in its finding.

*Extension of Time*

**{¶56}**  In the final portion of her first assignment of error, Mother argues the trial court's determination that S.P. could not be placed with her within a reasonable time was against the manifest weight of the evidence because Mother's motion for a six-month extension of temporary custody should have been granted.

**{¶57}**  First, R.C. 2151.415 does not provide that a parent may file a request for an extension of temporary custody to the agency.  *In the Matter of T.G.*, 2022-Ohio-1213 (5th Dist.).  Further, as part of the permanent custody hearing, the trial court found S.P. could not or should not be placed with either parent within a reasonable period of time.  R.C. 2151.414.  This finding precludes granting a motion to return the child to Mother.  *Id.*  Finally, Thomas testified the agency did not seek a six-month extension because Mother made no substantial progress on her case plan and did not obtain a bed at the homeless shelter until after the motion for permanent custody was filed.  Thomas does not believe any extension would be good for S.P. because she deserves permanency and an

extension would result in continued uncertainty and disappointment for S.P. The trial court's determination was not against the manifest weight of the evidence.

II.

{¶58} In her second assignment of error, Mother contends the trial court's determination that the best interest of the child would be served by granting permanent custody to SCJFS was against the manifest weight of the evidence. Mother cites to the fact that she regularly visited with S.P., and the statement by Sekula that S.P. told Sekula she wanted to be reunited with Mother.

{¶59} We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of the child should be accorded the utmost respect, given the nature of the proceeding and the impact that court's determination will have on the lives of the parties concerned." *In re Mauzy Children*, 2000 WL 1700073, * 3 (5th Dist. November 13, 2000), citing *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶60} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a

grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶61}** The court must consider all of the elements in R.C. 2151.414(D), as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schaefer*, 2006-Ohio-5513. *In re Schaefer* made it clear that a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. *Id.* The statute does not even require the court to weigh that factor more heavily than others." *Id.* at ¶ 64.

**{¶62}** The focus on the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

**{¶63}** We find the trial court did not commit error in finding that granting permanent custody to SCJFS is in the best interest of the child.

**{¶64}** Thomas testified it was in the best interest of S.P. for permanent custody to be granted. S.P. is happy at her current foster home and is bonded to the family. S.P. is able to have phone contact with Mother, her great-grandmother, and three of her other siblings. The foster family will continue to facilitate this communication with family

members. While Mother argues S.P. told Sekula she would like to one day return to Mother, Sekula's statement was that S.P. may like to go back with Mother if Mother had a home and if Mother were drug-free. Mother is still homeless and not drug-free. Further, since S.P. has been at the current foster home, she expressed a desire to stay there long-term.

{¶65} While Thomas testified there is a bond between Mother and S.P., that bond is more akin to a friendship and any damage that would occur from severing that bond between them would be outweighed by the benefits of permanency. Sekula also believes it is in the best interest of S.P. for the motion for permanent custody to be granted so S.P. can have the permanency and stability she did not have when she was with Mother.

{¶66} We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to SCJFS is in the best interest of the child is supported by competent and credible evidence. Further, the trial court did not lose its way and create a manifest miscarriage of justice such that the decision must be reversed and a new trial ordered. Mother's second assignment of error is overruled.

{¶67} Based on the foregoing, Mother's assignments of error are overruled.  The November 15, 2024, judgment entry of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

By Popham, J.,

Baldwin, P.J., and

Gormley, J., concur