[Cite as *In re K.B.*, 2025-Ohio-2997.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN RE: K.B. | Case No. 2025CA00042 |
| | <u>Opinion And Judgment Entry</u> |
| | Appeal from the Stark County Court of Common Pleas, Family Court Division, Case No. 2023JCV01129 |
| | Judgment:   Affirmed |
| | Date of Judgment Entry: August 21, 2025 |

**BEFORE:** CRAIG R. BALDWIN, P.J.; KEVIN W. POPHAM, J.; DAVID M. GORMLEY, J., Appellate Judges

**APPEARANCES:** BRANDON J. WALTENBAUGH for Appellee; PAUL M. GRANT for Appellant

OPINION

*Popham, J.*

{¶1}    Father appeals the April 22, 2025, judgment entry of the Stark County Court of Common Pleas, Family Court Division, terminating his parental rights and granting permanent custody of K.B. to Stark County Job and Family Services ("SCJFS").  For the reasons below, we affirm.

*Facts & Procedural History*

{¶2}    S.N. is the mother ("Mother") of K.B., who was born on October 2, 2022. A.S. is the father ("Father") of K.B.  In August 2023 SCJFS became involved with the family when Mother and K.B.'s sibling were in a car accident.  K.B.'s sibling, who was not

in a car seat at the time of the accident, sustained injuries. In September of 2023, K.B. broke his finger. On October 3, 2023, police responded to the home for a welfare check, and K.B.'s sibling was found home alone, caked in feces, with the house in a state of disarray. On October 4, 2023, SCJFS filed a dependency complaint. At the time the complaint was filed, the whereabouts of K.B. were unknown. Mother told SCJFS that K.B. was with his paternal grandmother named K.M. However, when the caseworker attempted to call the number provided by Mother, the number rang to the Barberton Police Department. Neither Mother nor her relatives would provide any information as to the whereabouts of K.B. at the time the complaint was filed. Mother provided SCJFS with the names of two individuals who could be K.B.'s father, but A.S. was not one of the named individuals.

{¶3} On October 4, 2023, the trial court held a shelter care hearing and placed both K.B. and his sibling into the temporary custody of SCJFS. The court also ordered Mother to immediately turn K.B. over to SCJFS. On October 11, 2023, SCJFS filed an amended complaint, listing A.S. as an alleged Father of K.B. The amended complaint stated that Mother finally admitted K.B. was with Father in Cleveland. Father brought K.B. to the Canton Police Department, and K.B. was placed in foster care.

{¶4} On November 1, 2023, the magistrate held a dispositional hearing. Father appeared at the hearing and requested counsel. After paternity was established, Father was added to the case plan in November of 2023. Father was ordered to obtain a parenting assessment at Summit Psychological Associates and follow all recommendations from the assessor; to attend all required appointments; to sign

releases; to attend Goodwill Parenting; to complete a drug and alcohol assessment; to remain substance-free; and to submit to random drug screens as requested by SCJFS.

{¶5} On December 26, 2023, the magistrate held an adjudicatory hearing during which the magistrate heard evidence. In a December 28, 2023, judgment entry, the magistrate found K.B. to be a dependent child. Further, the magistrate found SCJFS made reasonable efforts to prevent the need for placement and/or make it possible for K.B. to return home. On March 29, 2024, the magistrate held a dispositional review hearing and found the agency made reasonable efforts to develop a plan for permanent placement of K.B.

{¶6} On May 16, 2024, Father filed a motion to modify the case plan, seeking to remove language about Father's criminal history; to remove the requirement that he complete a drug and alcohol assessment; to remove the requirement that he participate in Goodwill Parenting; and to remove the requirement that he complete any further mental health treatment or evaluation. After hearing evidence, the magistrate granted Father's motion, in part – ordering that the case plan to be amended to correct any inaccurate statements regarding Father's criminal or drug history. Further, the magistrate ordered SCJFS to determine whether there is a comparable intensive parenting program located in Cleveland that Father could substitute for Goodwill Parenting. However, the magistrate denied the remainder of Father's motion and ordered the balance of the case plan to remain in effect.

{¶7} On August 21, 2024, SCJFS filed a motion to extend temporary custody to the agency. Father did not object to the motion. At a dispositional hearing on September

3, 2024, the magistrate found SCJFS made reasonable efforts to finalize the permanency plan, and extended temporary custody of K.B. to the agency until April 4, 2025.

{¶8} On September 27, 2024, Father was removed as an active case plan participant because he was not engaging in services and had not met with the caseworker in thirty days. In November of 2024, Father was added back as an active case plan participant after he attended an evaluation at Summit Psychological.

{¶9} On January 25, 2025, the trial court issued a judgment entry indicating that Father contacted the court and requested a court-appointed attorney. The court appointed an attorney to represent Father and noted in the judgment entry that Father had fired or threatened two previous attorneys.

{¶10} On February 18, 2025, SCJFS filed a motion for permanent custody of K.B.

{¶11} On February 28, 2025, the magistrate held a dispositional review hearing. In a judgment entry issued after the hearing, the magistrate found there were no compelling reasons to preclude a request for permanent custody. Specifically, the magistrate found Father had been terminated from mental health services for non-compliance, and was not visiting the child. On March 14, 2025, Father filed an objection to the magistrate's decision.

{¶12} On April 16, 2025, the trial court conducted a hearing on SCJFS's motion for permanent custody and on Father's objections to the magistrate's decision. The following testimony was adduced at the April 16th hearing.

{¶13} In February of 2024, Michael Stranathan ("Stranathan"), of Summit Psychological Associates, completed a parenting evaluation on Father. Father was initially cooperative and provided background information. However, Father became

argumentative and belligerent when Stranathan asked questions regarding Father's mental health history, substance abuse history, and legal history. Father told Stranathan those topics were irrelevant to Father's ability to safely parent K.B. Specifically, when Stranathan asked Father about his legal history, Father told Stranathan, "none of your fucking business, read the fucking report." When asked if he had any substance abuse history, Father told Stranathan to "fuck off." Father also was not willing to discuss his parenting knowledge, and indicated his parenting abilities should not be questioned. Stranathan was particularly concerned because, at one point, Father was at Northcoast Behavioral Health ("Northcoast") for restoration or treatment. Father refused to talk about his time at Northcoast and also refused to sign a release so Stranathan could obtain records from Northcoast.

{¶14} Stranathan described Father as argumentative, fantastical, and exhibiting considerable signs of paranoia. Stranathan diagnosed Father with other specified personality disorder with anti-social and narcissistic traits. Stranathan gave Father a provisional diagnosis of intermittent explosive disorder. The diagnosis was provisional due to Father's lack of cooperation with parts of the evaluation. Stranathan testified that psychiatric problems are at the crux of the issue regarding Father's ability to parent. Stranathan was particularly concerned about the lack of information surrounding Father's stay at Northcoast, because Father could not have checked himself into Northcoast voluntarily.

{¶15} Stranathan concluded any consideration for reunification between Father and K.B. should be contingent on the following: Father must cooperate and comply with a psychological evaluation in order to accurately identify necessary interventions; Father

must sign releases so the assessor can obtain copies of records from Northcoast and other treatment providers to obtain diagnostic clarity; Father must undergo a psychiatric evaluation to obtain diagnostic clarity and determine if medication would be helpful in reducing anger and impulsivity; Father must submit to drug screens; Father must participate in behavioral group therapy; and Father must complete a parenting class.

{¶16} Kimberly Gabel ("Gabel") is the SCJFS caseworker assigned to K.B. Gabel explained that Father was not initially named in the complaint because Mother did not provide his name as a potential father to K.B.; however, his paternity was established, and an amended complaint was filed. Gabel confirmed K.B. has been in the temporary custody of the agency since removal and has thus been in the temporary custody of the agency for at least twelve of the last twenty-two months.

{¶17} Gabel testified to Father's case plan and his progress on the case plan. Father's case plan objectives included completing a parenting assessment and following all recommendations issued as a result of the assessment, and completing a drug and alcohol assessment and following all recommendations made by the assessor. Father completed an evaluation with Stranathan and briefly initiated counseling services for two months. However, Father was unwilling to complete the remainder of Stranathan's recommendations, including engaging in psychiatric services, engaging in anger management therapy, submitting to random drug screens, and providing releases for medical records from Northcoast. Father also stopped individual counseling after two months.

{¶18} Gabel testified the agency made reasonable efforts to finalize a permanency plan for the child. These reasonable efforts included providing case plans

and amended case plans to Father, conducting family meetings wherein Father participated, facilitating virtual visits with Father, and regularly discussing with Father the expectations of him. Specifically, with regards to the case plan objectives, Gabel testified she spoke with Father multiple times about the case plan objectives. However, during these discussions, Father frequently yelled at her. In February of 2025, Father left a message for Gabel stating he refused to engage in mental health treatment service. During a virtual visit in March of 2025, Father screamed at Gabel that he was not going to engage in mental health services. During another discussion between Gabel and Father regarding his willingness to engage in mental health services, he called her a "liar," and informed her he was going to sue a variety of individuals.

{¶19} Though Father accused Gabel of ignoring a worker at Ohio Guidestone, Gabel stated she frequently communicated with the worker via email and telephone. In an attempt to address Father's concerns, in late 2024 Gabel facilitated and participated in a virtual meeting with Father and the Ohio Guidestone employee. However, the discussion was not productive because Father was yelling and screaming. Despite Father's actions, Gabel informed him during the call, and in correspondence after the call, what Father needed to do to meet the case plan objectives. Father also accused Gabel of not calling him back. Gabel testified she would contact Father, usually at the end of the day. However, Father would leave many messages each day.

{¶20} Father currently lives in Cleveland. Gabel has seen his current home, and it is appropriate and clean. However, there is no furniture in the child's room despite the fact that Father told Gabel he spent thousands of dollars on a bedroom set for K.B. Father

reported to Gabel that he is the owner of a "virtual café," and makes $4,000-$6,000 per month. Gabel was unable to verify that income or employment.

{¶21} Father did not consistently visit K.B. Father last attended visitation on November 15, 2024. Additionally, there was a period of time when Father did not visit K.B. for over ninety days (May 1 to August 7, 2024). Father initially stated he missed visits because he was sick or had car trouble. This transitioned to cancellation due to overall transportation issues. Father told Gabel that he had four cars, but also that he could not obtain transportation to the hearing. Gabel discussed bus routes with Father and mailed him a SARTA (Stark Area Regional Transit Authority) bus pass. SCJFS would not agree to off-site visits because there were safety concerns with Father. Similarly, SCJFS would not permit virtual visitation between Father and K.B. because virtual contact with Father was alarming. When Father visited, he interacted well with K.B.

{¶22} Gabel found Father a parenting class he could attend in Cleveland. However, she did not believe he should start the class until he stabilized his mental health. Gabel explained that Father posed a high level of risk and would not be successful in a parenting program that required the acceptance of redirection and feedback if his mental health was not stabilized.

{¶23} Gabel testified to ongoing concerns with Father, including Father's anger and explosiveness. In November of 2023, Father threatened to kill a multitude of individuals, including a former SCJFS worker. Father also continued to scream over people while they were talking, was not receptive to feedback, and was constantly argumentative. Gabel saw no improvement in his behavior during the course of the case.

{¶24} Father testified that K.B. lived with him since Mother dropped K.B. off when K.B. was three months old. K.B. stayed until he was eleven months old. Father did not take K.B. to the doctor because he had no paperwork. However, Father stated K.B. was healthy, except when Mother took K.B. to Canton and allegedly brought him back to Father with "his whole finger chopped off." Father testified he was able to meet all K.B.'s needs when K.B. lived with him, and he is still able to meet these needs.

{¶25} Father explained that he could not attend visits due to car problems. He also alleged SCJFS would change the dates and times of visits continually. He stated his cars "were going down" and stated he "couldn't keep affording to blow up cars, oil changes, my license started … I got too many tickets." Father then described the difficulty of getting a bus from Cleveland to Canton. He had to walk 4.5 hours to get to the bus station and it took another 1.5 hours on the bus to travel to Canton.

{¶26} Father testified he owns a "virtual café" in Cleveland and has "more than enough income" to pay his bills. Father stated he owns three cars. He testified, "I own some couple of decent nice cars. I mean I work hard. So what I own a Mercedes, a BMW. I work hard for those cars. But [they are] to the point where they cannot, they were going fine on the highway, but after this point they can't." When asked on cross-examination why he could not afford to fix his cars, he stated the cars "work fine," but "none of them will last an hour on the freeway anymore." He stated he lives "comfortably" with enough money to pay all his bills, but does not have enough money to "continually fix cars." Father stated he believes it is SCJFS's responsibility to transport him to Stark County and/or provide for visitation with K.B. in Cuyahoga County.

{¶27} When SCJFS counsel asked Father where he worked, he stated, "I don't have to answer you. I'm not repeating myself. Because that's ignorant, and this is disrespect." Father then stated he works for a café, and provided counsel with a homemade business card.

{¶28} Father acknowledged receiving copies of three case plans. Father stated that when he completed the parenting evaluation, Stranathan "copped an attitude" with him. Father admitted to smoking marijuana, but stated he never smoked it around K.B.

{¶29} Prior to beginning the second portion of the hearing (the "best interest" portion), the court asked if all parties wanted to stay to complete that portion of the hearing on April 16, 2025. All parties, including Father, agreed. However, as soon as SCJFS called Gabel to testify about best interest, Father stated he had to leave to catch a bus, and left the courtroom.

{¶30} Gabel testified K.B. is with his paternal aunt, and is doing well. The paternal aunt is currently going through the licensure process and hopes to adopt K.B. While Father does have a bond with K.B., Gabel believes the damage that occurs from severing the bond is outweighed by the benefits of permanency. Gabel concluded it is in the best interest of K.B. for permanent custody to be granted to SCJFS.

{¶31} The GAL filed a report that states it is in the best interest of the child to be placed in the permanent custody of SCJFS. At the conclusion of the hearing, the trial court asked K.B.'s paternal aunt for her opinion as to legal custody versus permanent custody, and K.B.'s aunt stated Father had threatened her life and the life of her children on numerous occasions. Thus, she felt legal custody "seems like the opening of the door for trouble."

{¶32} On April 22, 2025, the trial court issued a judgment entry containing findings of fact and conclusions of law, as follows: K.B. has been in the temporary custody of SCJFS for twelve or more months of a consecutive twenty-two month period; notwithstanding reasonable case planning and diligent efforts by the agency, Father has failed continuously and repeatedly to remedy the conditions that caused K.B. to be placed outside the home; Father abandoned K.B. by failing to maintain contact with K.B. for more than ninety days; and K.B. cannot or should not be placed with either parent at this time or within a reasonable period of time. The trial court found it is in the best interest of K.B. for permanent custody to be granted to SCJFS and any harm caused by severing any bond with Father is outweighed by the benefits of permanency.

{¶33} Father appeals the April 22, 2025, judgment entry of the Stark County Court of Common Pleas, Family Court Division, and assigns the following as error:

{¶34} "I. THE TRIAL COURT'S DECISION TO TERMINATE FATHER'S PARENTAL RIGHTS WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

*Permanent Custody*

{¶35} "[T]he right to raise [a child] is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

{¶36} Clear and convincing evidence is that evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "Where the degree of proof

required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* If some competent and credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶37} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal Co., Inc., v. Cleveland*, 10 Ohio St.3d 77 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997).

{¶38} R.C. 2151.414 sets forth guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice of the filing of a motion for permanent custody of a child by a public children services agency.

{¶39} Following the hearing, R.C. 2151.414(B)(1) authorizes the court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, has not been in the temporary custody of one or more of the children services agencies for twelve or more months of a consecutive twenty-two month period, and the child cannot be placed with either of the child's parents within a reasonable time

or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶40} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the circumstances delineated in R.C. 2151.414(B)(1)(a) through (e) is present before proceeding to a determination regarding the best interest of the child. In this case, as to Father, the trial court made findings pursuant to R.C. 2151.414(B)(1)(a) (reasonable time), R.C. 2151.414(B)(1)(b) (abandonment), and R.C. 2151.414(B)(1)(d) (temporary custody of the agency for twelve or more months of a consecutive twenty-two month period).

*Manifest Weight*

{¶41} Father argues the trial court's decision was against the manifest weight of the evidence. The standard of review for manifest weight in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [or

decision] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶42} Because the finder of fact is in the best position to weigh the credibility of the witnesses and observe their demeanor, a reviewing court will always be mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 2012-Ohio-2179.

I.

{¶43} Father makes several separate arguments in his assignment of error. He argues: the agency did not make reasonable efforts to assist in reunifying him with K.B.; the abandonment finding is against the manifest weight of the evidence because it is the agency's fault he could not visit during those ninety days; the agency did not provide clear and convincing evidence K.B. could not or should be returned to his care; and the trial court's determination that the best interest of the child would be served by granting permanent custody to SCJFS was against the manifest weight of the evidence.

{¶44} The trial court determined, pursuant to R.C. 2151.414(B)(1)(d), that K.B. has been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. Gabel testified K.B. was in the temporary custody of the agency from October of 2023 until the date of the hearing on April 16, 2025, a period of approximately eighteen months. Accordingly, the trial court's determination on the temporary custody prong was not against the manifest weight of the evidence.

{¶45} As findings under R.C. 2151.414(B)(1)(a), R.C. 2151.414(B)(1)(b), and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a

basis to grant the motion for permanent custody.  *In re Dalton*, 2007-Ohio-5805, ¶ 88 (5th Dist.).  This finding alone in conjunction with a best interest finding is sufficient to support the grant of permanent custody.  *In re Calhoun*, 2008-Ohio-5458, ¶ 45 (5th Dist.).  Because Father has not challenged the twelve-of-twenty-two-month finding, we would not need to address the merits of his claim with regards to the trial court's determination under 2151.414(B)(1)(a) (reasonable time) or R.C. 2151.414(B)(1)(b) (abandonment).  However, as detailed below, even if we consider Father's argument, we find the trial court did not commit error in its determination under either R.C. 2151.414(B)(1)(a) - Reasonable Time, or R.C. 2151.414(B)(1)(b) - Abandonment.

*Reasonable Efforts*

{¶46}  Father argues the agency did not make reasonable efforts to assist him in reunifying with K.B.

{¶47}  First, the Supreme Court of Ohio has held the trial court is not obligated by R.C. 2151.419 to make a determination that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing.  *In re C.F.*, 2007-Ohio-1104; R.C. 2151.419.  The trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-deposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state."  *Id*. at ¶ 41; *In the Matter of L.J.*, 2019-Ohio-5231 (5th Dist.).

{¶48} In this case, the record reflects the magistrate made reasonable-efforts findings at various points throughout the case, as demonstrated in judgment entries after the hearings held on December 26, 2023, March 29, 2024, September 3, 2024, and February 28, 2025. Father did not object to any of these findings by the magistrate. Consequently, the agency did not need to prove at the permanent custody hearing that it made reasonable reunification efforts. *Id.*

{¶49} Notwithstanding the previous findings of reasonable efforts, appellee also established at the permanent custody hearing that its case planning and efforts were reasonable and diligent under the circumstances.

{¶50} Gabel testified to the case planning and diligent efforts made by SCJFS, including establishing a case plan and notifying Father of its requirements. Gabel regularly discussed case plan expectations with Father via telephone. Gabel communicated with the Ohio Guidestone worker and facilitated a virtual visit with Father.

{¶51} According to Father, SCJFS "set him up to fail" because they would not allow him to go to parenting class, or find him a parenting class, in Cleveland. Further, he claims that SCJFS failed to make reasonable efforts because they would not help him find transportation to visits and would not schedule visits in Cleveland or schedule virtual visits. However, Gabel specifically testified she found Father a parenting class in Cleveland, but that she made clear to Father that he needed to stabilize his mental health prior to enrolling in the program. Father's continued yelling, screaming, and threatening of individuals involved in the case (SCJFS workers, evaluators, attorneys) demonstrates the need for Father to stabilize his mental health prior to enrolling in parenting class. As to visitation, Gabel testified she inquired about visitation in Cleveland, but they were

unable to provide a secured location for visitation.  Given Father's volatility, this was not an acceptable option.  Gabel also specifically testified she would not agree to virtual visits because Father's behavior during virtual or phone contact with the agency was so poor.

{¶52}  The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case.  *In the Matter of J.H.*, 2019-Ohio-5184 (5th Dist.).  It was Father's choice to refuse to answer questions at the evaluation, his choice to refuse to engage in mental health services, and his choice to act poorly such that unsupervised or virtual visitations were not options.  We find there is competent and credible evidence to support the trial court's determination that SCJFS's efforts were reasonable and diligent under the circumstances of the case, and the trial court did not lose its way in its finding.

*R.C. 2151.414(B)(1)(b) - Abandonment*

{¶53}  Father next challenges the trial court's finding that he abandoned K.B.  He argues any abandonment that occurred was due to the agency's refusal to help transport Father to visits in Canton or establish visits in Cleveland.

{¶54}  R.C. 2151.414(B)(1)(b) applies when "[t]he child is abandoned."  A child is presumed to be abandoned when the child's parents "have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."  R.C. 2151.011(C).

{¶55}  There is no dispute that Father failed to visit from May 1 to August 7, 2024, a period of more than ninety days.  As detailed above, SCJFS made efforts to assist Father with transportation in the form of bus passes and bus schedules.  Further, virtual visits and/or visits in Cleveland could not be facilitated due to Father's actions.  The trial

judge, therefore, had clear and convincing evidence that K.B. was presumptively abandoned, and the judge had no reason to conclude that the presumption was rebutted.

*R.C. 2151.414(B)(1)(a)- Reasonable Time*

{¶56} Father argues the trial court's determination that K.B. could not or should not be placed with him in a reasonable time to be against the manifest weight of the evidence.

{¶57} Pursuant to R.C. 2151.414(E), the trial court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The statute also specifically provides that if the trial court determines, by clear and convincing evidence, at a hearing that one or more of the factors listed in R.C. 2151.414(E)(1)-(15) exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *In re William S.*, 75 Ohio St.3d 95 (1996). The trial judge in this case relied on two of these factors: R.C. 2151.414(E)(1) and (10).

{¶58} R.C. 2151.414(E)(1) applies when "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly … to substantially remedy the conditions causing the child to be placed outside [the child's] home." In making such a determination, "the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for

the purpose of changing parental conduct to allow them to resume and maintain parental duties." *Id.* R.C. 2151.414(E)(10) applies when "[t]he parent has abandoned the child." As detailed above, we find the trial court's determination that Father abandoned K.B. to be supported by clear and convincing evidence, and not against the manifest weight of the evidence.

*R.C. 2151.414(E)(1)*

{¶59} We find clear and convincing evidence in the record that R.C. 2151.414(E)(1) applies. SCJFS provided Father with a case plan that outlined the steps he needed to complete in order to be reunited with K.B. Despite this, Father did not make any significant progress. Gabel testified that Father continued to have anger and impulsivity issues. This testimony was corroborated by Father's outbursts during his testimony and during the testimony of other witnesses at the hearing. Father refused to allow Stranathan access to mental health records that Stranathan needed to complete an evaluation, and Father refused to comply with any of the recommendations made by Stranathan regarding mental health evaluation or treatment. Father also refused to provide Gabel with documentation about his employment or income.

{¶60} We find the trial court did not clearly lose its way or create a manifest miscarriage of justice such that the decision must be reversed and a new trial ordered when it determined K.B. cannot be placed with Father within a reasonable time or should not be placed with Father.

*Best Interest*

{¶61} The final argument Father makes is that the trial court's determination that the best interest of the child would be served by granting permanent custody to SCJFS

was against the manifest weight of the evidence. Father cites to the fact that his visits with K.B. went well, and the testimony by Gabel that there is a bond between Father and K.B.

{¶62} We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children*, 2000 WL 1700073, * 3 (5th Dist. November 13, 2000), citing *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶63} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶64} The juvenile court must consider all of the elements in R.C. 2151.414(D), as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schaefer*, 2006-Ohio-5513. *In re Schaefer* made it clear that a trial court's statutory duty, when determining whether it is in the best

interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than others." *Id.* at ¶ 64.

{¶65} The focus on the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶66} We find the trial court did not commit error in finding that granting permanent custody to SCJFS is in the best interest of the child. Gabel testified it is in the best interest of K.B. for permanent custody to be granted to SCJFS. K.B. is happy at his current placement with his paternal aunt and is bonded to the family. The family is interested in adoption. The GAL also stated in his report that it is in the best interest of K.B. for permanent custody to be granted to SCJFS. While Gabel testified there is a bond between Father and K.B., she also testified that any damage that would occur from severing that bond between them would be outweighed by the benefits of permanency.

{¶67} We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to SCJFS is in the best interest of the child is supported by competent and credible evidence.

Further, the trial court did not lose its way and create a manifest miscarriage of justice such that the decision must be reversed and a new trial ordered.

{¶68}  Based on the foregoing, Father's assignment of error is overruled.  The April 22, 2025, judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

For the reasons stated in this Opinion, the judgment of the Stark County Court of Common Pleas, Family Court Division is affirmed .

Costs to Appellant.

By: Popham, J.

Baldwin, P. J. and

Gormley, J. concur.